Frank R. DAVIS, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 484S142.

Supreme Court of Indiana.

May 22, 1985.

Rehearing Denied July 15, 1985.

Gregory H. Hofer, LaPorte, Jere L. Humphrey, Plymouth, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Frank R. Davis, pled guilty on January 12, 1984, to two counts of murder, Ind.Code § 35-42-1-1 (Burns 1985 Repl.), and two counts of attempted murder, Ind.Code §§ 35-41-5-1; 35-42-1-1 (Burns 1985 Repl.). Under the terms of the plea agreement, the state agreed to dismiss four counts of criminal deviate conduct and two counts of felony murder but reserved the right to seek imposition of the death penalty, Ind.Code § 35-50-2-9 (Burns 1985 Repl.) on the two murder counts. A sentencing hearing was conducted on January 18, 1984, during which both the state and the defendant introduced evidence. On January 25, 1984, the court imposed a sentence of death on the two murder counts and consecutive terms of fifty years each on the two counts of attempted murder.

Defendant raises six issues in this direct appeal which we have consolidated into the following four issues:

1. Whether it was reversible error for the trial court to find the existence of a statutory aggravating circumstance which was not charged by the state and which was in addition to the two statutory aggravating circumstances charged by the state;

2. Whether it was reversible error for the trial court to find that the evidence supported a finding that both murders were committed while committing the underlying felony of child molesting when the actual act of molestation had been completed prior to the act of killing;

3. Whether it was reversible error for the trial court to find that the evidence supported a finding of the aggravating circumstance of "lying in wait" in both murders; and

4. Whether the trial court erred by failing to consider certain alleged mitigating circumstances.

A review of the facts from the record shows that the charges in this case arose from three separate incidents. On January 10, 1983, a fifteen year old boy, J.S., left a store in LaPorte, Indiana, where he had been playing a video game. It was about 5:00 p.m. and his route home took him through a cornfield. As he walked through the field, he noticed that someone

was following him. Then that man ran on ahead of J.S. and waited for him at the end of the cornfield. When J.S. got close to the man, the man grabbed him, pulled out a gun, and forced J.S. into a wooded area. Then the man told J.S. to sit down and started talking to him. The man knew J.S.'s name, where he lived, his sister's name, and his girlfriend's name. When J.S. asked the man how he knew all of that, the man said, "Well, I just do."

After a little while, the man made J.S. move to another part of the woods and tied a wire around J.S.'s neck. The other end of the wire was around his own hand. The man then took down the boy's pants and performed oral sex on him. Then he told J.S. he was going to take the wire off his neck, but instead pulled it tighter until J.S. passed out. When J.S. regained consciousness, the man did take the wire off of his neck and forced him to go to a different part of the woods and lie down on his stomach.

J.S. pleaded with the man not to shoot him, but the man said that if he let him go, he would tell the police what happened. J.S. said he wouldn't tell and finally the man said he would knock him unconscious. He hit the boy on the back of the head with the gun and the boy pretended to be unconscious. The man continued hitting him with the gun, about eight or nine times. Then he pushed the boy with his foot to see if he moved and ran off.

J.S. lay still for several minutes to be sure the man had gone and then got up. He was bleeding a great deal and felt dizzy and lightheaded but he was able to walk to his house. His mother immediately took him to the hospital. J.S. said the man told him his name was Frank but J.S. had never seen him before. At the sentencing hearing, J.S. identified defendant as the man who had done these things to him.

The second incident occurred on June 16, 1983, when defendant saw a teenage boy, D.R., at the home of one of his relatives. Defendant gave D.R. and other youths in that neighborhood rides on his motorcycle. He and D.R. made plans to meet later in the evening. That night, about 10:00 p.m., defendant hid and waited for D.R. by some railroad tracks. He heard D.R. walk by that location and called out to him. D.R. stopped and both he and defendant drank a beer.

After a few minutes, D.R. said it was late and he had to go home. Defendant then threatened D.R. with a knife and tied a wire around his hands and neck. He took him into some weeds beside the tracks. Defendant performed oral sex on D.R. and then choked him fatally with his hands. Finally defendant carried D.R.'s body across a fence and left the body in some weeds.

The third incident occurred on June 18, 1983, when two teenage boys, E.F. and J.L., decided to go camping at a camp area just south of LaPorte, Indiana. They took a tent, sleeping bags, cooking gear, and an axe. After they set up their tent, they went to get firewood. While they were walking along some railroad tracks looking for dry firewood, they saw defendant sitting beside the tracks. He was smoking a marijuana cigarette and asked the two boys if they wanted to share it. The boys accepted his offer and defendant told them his name was Frank Davis. The three talked for a short time about growing marijuana and the boys told defendant where they were camping.

Later that evening, defendant came to the boys' campsite riding a motorcycle. He brought more marijuana cigarettes and the three sat inside the tent for about half an hour. Defendant left on his motorcycle when it was getting dark. The boys sat around their campfire for awhile and then J.L. went to sleep in the tent while E.F. lay down in his sleeping bag outside the tent. Some campers next to the boys were partying and were playing loud music. Consequently, E.F. had trouble going to sleep and got up and sat on the picnic table for a time. Eventually, he did lie down and go to sleep.

Meanwhile defendant had returned to the camp area to watch the boys. He did not make his presence known to the boys but

was in his own words, "lurking around, waiting." He watched the boys go to sleep and waited while the people at the next campsite quieted down. Then he went into the tent and woke up J.L. He forced J.L. to go down by the railroad tracks with him at knifepoint. Then he tied up J.L. with wire and performed oral sex on him. Defendant and J.L. then walked a little further along the tracks. Finally, defendant strangled J.L. with a piece of wire and dragged his body off into the weeds. Defendant kissed the dead boy and left him there.

Then defendant went back to the boys' campsite and woke up E.F. He told him that J.L. had been hurt while riding the motorcycle and needed help. E.F. got up and went so quickly with defendant that he did not pause to get his eyeglasses. However, he did pick up the axe when defendant told him to. When defendant and E.F. got away from the campsite and out by the railroad tracks, defendant used his knife to force E.F. to lie down. He took the axe and tied E.F.'s hands with wire. Defendant performed oral sex on E.F. and then made him roll over on his stomach. He hit E.F. on the head with the axe four times. E.F. only remembered being hit once before he lost consciousness. He woke up in the hospital with four wounds on his head. The blows to his head damaged his peripheral vision and he has suffered seizures, dizziness, headaches, nausea, and nightmares and had difficulty walking.

E.F. told the police that a man named Frank Davis was his assailant and defendant was subsequently arrested. He gave a statement to police about his involvement in all four crimes and this statement was introduced as evidence at the sentencing hearing.

I:

Defendant's first issue raises a question of first impression for this Court in the application of the death penalty statute, Ind.Code § 35–50–2–9 (Burns 1985 Repl.). Defendant contends that it was reversible error for the trial court to find the exist-

ence of an aggravating circumstance to support the imposition of the death penalty which was not charged by the state, in addition to finding the existence of the two aggravating circumstances which were specifically charged by the state.

The record shows that the state charged that the murders of D.R. and J.L. were committed while committing child molesting and were committed by lying in wait. These are two of the specific aggravating circumstances which are listed in the death penalty statute. The state did not charge the aggravating circumstance of having committed another murder, but on the murder count of J.L. the trial court specifically found that one aggravating circumstance was the previous murder of D.R. The court also found that the two aggravating circumstances charged by the state were supported by the evidence.

■ In considering the language of the death penalty statute, we find that the state's burden is divided into two separate stages. First the state must allege "*at least one* of the aggravating circumstances" in the information seeking the death penalty; then at the sentencing hearing, the state "must prove beyond a reasonable doubt the existence of *at least one* of the aggravating circumstances alleged." Ind. Code § 35–50–2–9 (emphasis added). This language clearly does not limit the state to alleging or proving only one of the statutory aggravating circumstances. Thus there is no error when the state alleges and proves two aggravating circumstances as it did in the instant case.

■ We further conclude that there was no error in this case when the trial court found there was a statutory aggravating circumstance in addition to the two aggravating circumstances proved by the state as such finding was appropriate as part of the court's careful consideration of the specific facts and circumstances of this case. The two separate stages of our death penalty statute correspond with the two stages of a death penalty proceeding described by the United States Supreme Court as the

"definition stage" and the "selection stage." *Zant v. Stephens*, (1983) 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235. The Court said:

"Our cases indicate, then, that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."

*Zant v. Stephens*, 462 U.S. at 878–879, 103 S.Ct. at 2743–2744, 77 L.Ed.2d at 250–251 (footnote omitted).

In this case, the two statutory aggravating circumstances alleged by the state in the information provided the proper narrowing function at the "definition stage" so that the defendant in this case is adequately differentiated in a rational and objective way from defendants in other murder cases where the death penalty may not be imposed. The trial court at the sentencing hearing, or "selection stage," is not required to ignore other possible aggravating factors when the individualized determination of the sentence is being made.

In this case, the court explained its reasons for finding the additional aggravating circumstance in the following way:

"3. The defendant has committed another murder at anytime regardless of whether he has been convicted of that other murder pursuant to I.C. 35–50–2–9(B)(8).

"This aggravating circumstance was not enumerated on a sheet separate from the charging information as were Counts XI through XVI seeking the death penalty. However, the evidence clearly shows that the defendant was on notice of the existence of this aggravating circumstance prior to the time of entering his pleas of guilty and the acceptance of the pleas of guilty and entry of conviction by the court. Although the State failed to have the specific aggravating circumstance specifically enumerated on a separate page, the court determines that that failure does not bar the presentation of evidence on this aggravating circumstance nor does it prevent the finding of the existence of this aggravating circumstance beyond any reasonable doubt. *Brewer vs. State* [275 Ind. 338], 417 N.E.2d 889 (page 906).

"The evidence introduced clearly establishes beyond a reasonable doubt and the defendant's confession substantiates beyond a reasonable doubt that the defendant, Frank Davis, murdered D.R. on or about June 16, 1983, and the defendant, Frank Davis, murdered J.L. on or about June 19, 1983, and further that the defendant committed the murder of J.L. knowing that he had committed the murder of D.R."

We find no error in the court's finding of the additional aggravating circumstance in this case since defendant did have specific notice of the two aggravating circumstances the state had alleged and the state's burden to prove beyond a reasonable doubt the existence of these two aggravating circumstances did not change. During the sentencing phase of the proceeding, the trial court was properly to consider the specific circumstances of the instant offenses and the nature of the defendant. The court had before it defendant's guilty pleas to the commission of the two murders and the two attempted murders. Therefore, it could properly consider the conviction on the first murder count as an aggravating circumstance in deciding to recommend the death penalty on the other murder count. *See Judy v. State*, (1981) 275 Ind. 145, 416 N.E.2d 95.

Defendant did have notice of the specific reasons for the filing of the death penalty information and obviously was aware that the court would consider all the facts surrounding the crimes during the sentencing hearing. There was no error in the court's

finding of the additional aggravating circumstance of the commission of another murder under the circumstances of this case.

■ Furthermore, this Court has carefully reviewed the procedure for sentencing set out in our death penalty statute. We have found that our statute provides that the death penalty may be imposed if the circumstances of the offense and the character of the offender both warrant. The necessary standards and guidance for making the sentencing decision are found by looking at our criminal statutes and procedural rules in their entirety. The sentencing procedure adequately protects each individual's constitutional rights. *Williams v. State,* (1982) Ind., 430 N.E.2d 759; *Brewer v. State,* (1981) 275 Ind. 338, 417 N.E.2d 889; *Judy v. State,* (1981) 275 Ind. 145, 416 N.E.2d 95.

Our statute limits the imposition of death sentences so as to insure that they will not be inflicted arbitrarily or capriciously in accord with the decisions and opinions of the United States Supreme Court. *Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929. The trial court used the proper standards in making the sentencing determination in this case. The finding of the additional circumstance was within its proper discretion and was not the sole basis for the imposition of the death penalty.

## II.

■ Defendant next alleges that there was not sufficient evidence to prove that the murders of D.R. and J.L. were committed "while committing the underlying felony of child molesting." Ind.Code § 35–50–2–9(B)(1). He contends that the actual sexual act was completed in each case before the murder occurred and therefore the two murders were not committed "while" committing the underlying felony of child molesting. We do not agree with defendant's narrow interpretation of the word "while."

Although we have not previously considered this word as it is used in the death penalty statute, we have repeatedly found that the phrase "while committing" denotes a continuing chain of events under our felony-murder statute. In other words, when there is a close proximity in terms of time and distance between the underlying felony and the homicide and there is no break in the chain of events from the inception of the felony to the time of the homicide, we treat the two events as part of one continuous transaction. *Stroud v. State,* (1979) 272 Ind. 12, 395 N.E.2d 770.

According to Webster, the word "while" has more than one meaning, but the primary meaning of the word when it is used as a conjunction is "during the time that" or "as long as." *Webster's Third Dictionary* (Unabridged ed. 1961). This clearly implies a continuity of action over a span of time. The use of the word "while" in our felony murder statute comports with this definition as do our older cases. In *Bissot v. State,* (1876) 53 Ind. 408, we found that a homicide was deemed committed during the perpetration of a felony if the homicide was within the *res gestae* of the felony. And in a civil case, we specifically held that the term "while" "is the equivalent of and means *during the time* they are stockholders in the company." *Stafford v. St. John,* (1905) 164 Ind. 277, 289, 73 N.E. 596, 600 (emphasis added). We find no reason to believe that the legislature intended a different meaning of the word "while" in the death penalty statute than has been used for that word in the felony murder statute and in older cases.

The Supreme Court of Ohio reached a similar conclusion when it considered the use of the word "while" as it was used in the Ohio death penalty statute. The court said:

"The term 'while' does not indicate, as appellant contends, that the killing must occur at the same instant as the attempted rape, or that the killing must have been caused by the attempt, but rather, indicates that the killing must be directly associated with the attempted rape as

part of one continuous occurrence, a situation present in the instant cause."

*State v. Cooper,* (1977) 52 Ohio St.2d 163, 370 N.E.2d 725, 736, rev'd on other grounds *Cooper v. Ohio,* (1978) 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1157.[1]

■ In carefully reviewing the evidence, we find that both murders occurred very close in time and location to the completion of the sexual acts. D.R. was tied with wire before the sexual act was performed and then defendant strangled him with his hands while he was still bound with the wire. In the case of J.L., defendant again tied him with the wire before performing the sexual act. Defendant then allowed the boy to get up and started walking with him along the railroad tracks. He strangled J.L. with some wire before they had walked very far. We find this evidence shows that in both cases there was a close proximity in terms of time and distance between the sexual act and the homicide and there was no break in the chain of events. Here, in both cases, the felonies and the homicides were so closely connected in time, place, and continuity of action as to be one continuous transaction. In both cases, the homicides were committed while committing the acts of child molesting within the meaning of the statute.

### III.

Defendant next contends that there was not sufficient evidence to prove that the murders of D.R. and J.L. were committed "by lying in wait." Ind.Code § 35-50-2-9(b)(3). The elements constituting "lying in wait" have not previously been discussed by this Court but there is a well defined meaning of that phrase in the common law. A concise definition of "lying in wait" was given by Justice Traynor of the California Supreme Court in his concurring opinion in *People v. Thomas,* (1953) 41 Cal.2d 470, 480, 261 P.2d 1, 7: "Lying in wait requires the elements of waiting, watching, and concealment for the purpose of taking a victim

unawares." California courts have further defined the phrase as:

"a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

*Richards v. Marin County Superior Court,* (1983) 146 Cal.App.3d 306, 194 Cal. Rptr. 120, 124. *See also Domino v. Superior Court of Alameda County,* (1982) 129 Cal.App.3d 1000, 181 Cal.Rptr. 486.

Other jurisdictions have considered various aspects of this phrase. The Supreme Court of North Carolina defined the element of concealment in *State v. Allison,* (1979) 298 N.C. 135, 257 S.E.2d 417. It said that lying in wait refers to:

"a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim. An assailant who watches and waits in ambush for his victim is most certainly lying in wait. However, it is not necessary that he be actually concealed in order to lie in wait. If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait. Certainly one who has lain in wait would not lose his status because he was not concealed at the time he shot his victim. The fact that he reveals himself or the victim discovers his presence will not prevent the murder from being perpetrated by lying in wait. Indeed, a person may lie in wait in a crowd as well as behind a log or a hedge."

257 S.E.2d at 425 (citations omitted).

The Arizona Supreme Court found that while concealment is an essential element

---

1. This case was reversed when the Ohio death penalty statute was found to be unconstitutional because it limited the range of mitigating circumstances which could be considered. *See*

*Lockett v. Ohio,* (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973. The Supreme Court did not consider the aggravating circumstances of the Ohio statute.

of murder by lying in wait, the victim's discovery of the defendant's presence before the murder does not prevent a finding of murder by lying in wait. *State v. Miller,* (1974) 110 Ariz. 489, 520 P.2d 1113, 1114. Other courts have considered the facts of each specific case in light of the common law definition of lying in wait and found that there was sufficient evidence to establish murder by lying in wait. *Moser v. State,* (1975) 91 Nev. 809, 544 P.2d 424; *People v. Ward,* (1972) 27 Cal.App.3d 218, 103 Cal.Rptr. 671; *People v. Rosoto,* (1962) 58 Cal.2d 304, 23 Cal.Rptr. 779, 373 P.2d 867; *People v. Sutic,* (1953) 41 Cal.2d 483, 261 P.2d 241; *People v. Tuthill,* (1947) 31 Cal.2d 92, 187 P.2d 16.

However, in some cases, the courts have found there was not sufficient evidence to find that the murders were committed by lying in wait: *Richards v. Marin County Superior Court,* 194 Cal.Rptr. 126 (no attempt at concealment); *Domino v. Superior Court of Alameda County,* (1982) 129 Cal.App.3d 1000, 181 Cal.Rptr. 486 (murder committed one to five hours after the period of lying in wait); *People v. Merkouris,* (1956) 46 Cal.2d 540, 297 P.2d 999 (no attempt at either concealment or secrecy).

■ Although Indiana cases have not discussed the elements of "lying in wait," they have held that the act of "lying in wait with a deadly weapon" is a specific circumstance which can be used to enhance a penalty and can be proof of a defendant's specific intent to commit murder. In these cases, the actions involved in the "lying in wait" always included the elements of waiting, watching, concealment, and taking the victim by surprise. *Vasquez v. State,* (1983) Ind., 449 N.E.2d 284; *Andrews v. State,* (1982) Ind., 441 N.E.2d 194; *Petillo v. State,* (1950) 228 Ind. 97, 89 N.E.2d 623. Therefore, we find that the common law definition does apply in Indiana and the elements necessary to constitute "lying in wait" are watching, waiting, and concealment from the person killed with the intent to kill or inflict bodily injury upon that person.

In the instant case, the trial court gave a succinct statement of his reasons for finding the existence of the aggravating circumstance of "lying in wait" on both counts of murder. We agree with the trial court's finding in the case of D.R. but cannot agree with it in the case of J.L. On the count of the murder of D.R. the trial court specifically found that the defendant intentionally killed D.R. while committing the act of child molesting within the meaning of the statute. The court then made the following findings concerning the "lying in wait":

"The evidence establishes beyond any reasonable doubt that the defendant was in the area of the railroad tracks at approximately 10:00 o'clock p.m. and that he was waiting for D.R., knowing that D.R. would pass by that area on his return home. The evidence also clearly establishes that while the defendant was waiting for D.R. he was located off to the side of the road in an area that is below the level of the road. The evidence also establishes beyond any reasonable doubt that during the time and at the time that the defendant was waiting for D.R., that the defendant had in his possession a deadly weapon, i.e., a knife, together with a wire ligature ultimately used on the victim, D.R.

"The court now finds that the totality of the circumstances presented in the evidence and the reasonable inferences drawn therefrom by any reasonable man establishes that the defendant did in fact have the intent to sexually molest the victim, D.R. and had also formulated the intent to kill D.R. while lying in wait."

■ These findings which are supported by the record show that defendant was watching and waiting for D.R. and was concealed from D.R. as it was a dark night and defendant was off to the side of the road where he could not be observed. Defendant had a knife and wire ligature with him. Defendant's actions and preparations show that he had the necessary intent to kill D.R. or inflict bodily injury upon him. The fact that defendant had talked to D.R. earlier that day and made arrangements to

meet him does not prevent a finding of "lying in wait" in this case, as defendant did not stand openly out on the road in order to meet D.R. but did conceal himself off to the side of the road.

Furthermore, defendant confronted D.R. by surprise as he called out to him from his concealment beside the road to get D.R. to stop. Although defendant then talked to D.R. in a friendly manner for a few minutes, as soon as D.R. said he had to be going, defendant bound him with the wire. The sexual act and the killing then followed within a few minutes of each other and in approximately the same location. This was sufficient proximity of time and place to defendant's concealment to support the trial court's finding that the murder was committed by lying in wait.

■ On the count of the murder of J.L., the trial court gave the following statement of his reasons for finding that the murder had been committed by "lying in wait":

"The evidence establishes beyond a reasonable doubt that the defendant in his own words was 'lurking around' the area where the victim, J.L. and his companion E.F. were camping. The evidence further shows that the defendant remained in the general area and out of the sight of J.L. and E.F. for a number of hours until such time as the other campers in the area quieted down for the evening in order that the defendant could remove J.L. from the area without being seen. The evidence further shows beyond a reasonable doubt that while waiting for the area to quiet down, the defendant, Frank Davis, had in his possession a deadly weapon, i.e. a knife, together with the wire ligatures previously described. The evidence further shows that once the area was quieted, the defendant did in fact remove the person of J.L. from the area by use and threat of use of a deadly weapon."

The evidence here does show defendant concealed himself from J.L. and E.F. and waited and watched until the other campers were asleep. However, defendant then openly went into the tent and woke J.L. He forced him at knifepoint to leave the tent and go away from the camp vicinity to a more deserted area where the sexual act and killing occurred. In this case defendant did watch and wait from a concealed position for the other campers to go to sleep. However, he did not use the concealment as a direct means to attack or gain control of the victim. Rather he went openly into the tent and then forced J.L. to go with him by the use of a deadly weapon. There was not a sufficient connection between the concealment and the murder here to support a finding that this murder was committed "by lying in wait." Although the trial court erred in finding that this aggravating factor was supported by the evidence, this erroneous finding does not affect the court's imposition of the death penalty on this count as the other statutory aggravating circumstance which was also charged on this count was proved beyond a reasonable doubt. Furthermore, the court specifically found that the mitigating evidence was outweighed by any one of the aggravating circumstances as we discuss in Issue IV.

### IV.

Defendant finally alleges that the trial court erred by failing to consider the mitigating circumstances of his personal history. The court made a written finding of his consideration of mitigating circumstances after each count of murder and each count of attempted murder. For the count of the murder of J.L. the court made the following findings of mitigating circumstances:

"Pursuant to I.C. 35–50–2–9 subsection (C) the mitigating circumstances to be considered by the court are as follows:

"1. The defendant has no significant history of prior criminal conduct.

"The evidence introduced and considered by the court reflects that the defendant has in fact a prior criminal and juvenile record which began at the approximate age of thirteen (13). The evidence also established that the defendant was re-

leased from the Indiana Department of Corrections in approximately September of 1982, after serving approximately six (6) years of a twenty (20) year sentence for his conviction of Escape and Committing a Felony While Armed With a Deadly Weapon. The evidence also clearly shows that the charge here involved and for which the defendant is being sentenced occurred within less than one year of the defendant's release from the Indiana Department of Corrections.

"2. The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.

"The evidence presented by way of psychiatric testimony at sentencing hearing established that the defendant has an emotional or character disorder which is antisocial in nature. The testimony of the psychiatrist further established that the defendant, during the period of time in which the murder was committed, was under emotional pressure which may have triggered the emotional or character disorder. However, the testimony does not establish that the defendant was under a mental or an emotional disturbance when he committed the murder. The record would reveal that the defendant was found competent to stand trial, that he was examined for his sanity or insanity at the time of the offense and that subsequent to the examination and the filing of their reports and prior to the commencement of trial, the defendant withdrew his plea of not guilty by reason of insanity. The record taken at the time of the entry of the plea of guilty also substantiates that the defendant now believes that he is not suffering from any form of mental illness and that he has never been treated for any form of mental illness. The court further determines that the evidence establishes that the defendant may have been under some form of pressure or confronted with frustration experienced in day to day living but that the pressure or frustration does not attain or even approach a level of extreme mental or emotional disturbance.

"3. The victim was a participant in or consented to the defendant's conduct.

"The evidence clearly establishes that J.L. was held at bay by the use of a deadly weapon, i.e. a knife, while the wire ligatures were placed upon his hands and neck. The evidence further establishes that he was secured in such a manner throughout the completion of the sex act and that there is absolutely no indication or evidence presented that would support the idea that J.L. consented to or was a willing participant. In fact, the evidence conclusively shows that J.L. was not a willing participant.

"4. The defendant was an accomplice in a murder committed by another person and the defendant's participation was relatively minor.

"The evidence presented before the court establishes beyond any doubt that the defendant was solely responsible for the death of J.L.

"5. The defendant acted under the substantial domination of another person.

"The evidence is completely lacking of any assertion of this mitigating circumstance.

"6. The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

"There was evidence presented to reflect that during the course of the day when Frank Davis had previously encountered E.F. and J.L., that marijuana was used by both the defendant as well as the victim. There was no showing, however, by the evidence that the defendant was either intoxicated or under the influence of drugs at the time of the death of J.L.

"Further, there is no evidence that the defendant was substantially impaired as a result of mental disease or defect at the time of the murder of J.L.

"7. Any other circumstances appropriate for consideration.

"The court has determined that the defendant was housed in the Westville Correctional Center as a juvenile at which time it was referred to as Beattys Memorial Hospital. While there, the defendant was sexually abused by one of the attendants as well as being abused by at least one of the inmates at the facility. The evidence further shows that the attack by the inmate at the facility is very similar in nature to the attack upon the person of J.L. committed by the defendant, Frank Davis. The court finds some insight as to why the defendant has behaved in the manner that he did by this evidence, but the court determines that the evidence is simply not sufficient to show any justification or excuse for the acts perpetrated by the defendant upon the person of J.L."

The court's findings after the murder of D.R. are similar but specifically tailored to the facts of that crime. The court also made a specific finding on mitigating circumstances after the two counts of attempted murder in which it considered the fact that defendant had withdrawn his plea of not guilty and entered a plea of guilty to the crimes charged to be a mitigating circumstance. The court further considered the fact that defendant had given a confession to the police as a possible mitigating circumstance. However, the court also specifically found that the mitigating circumstances did not outweigh the aggravating circumstances on the two counts of attempted murder.

 Contrary to defendant's assertions, the record as cited above shows that the trial court made a thorough and detailed consideration of all of the relevant mitigating circumstances in this case. The court considered defendant's personal history and institutionalization as a child as well as his emotional problems, but reached the conclusion that defendant did not have an extreme mental or emotional disturbance and was not substantially impaired as a result of mental disease or defect at the time of the murders. The record shows that the court considered defendant's background and emotional state at several different places in its discussion of the facts and the mitigating circumstances and properly weighed those factors as mitigating circumstances when it spoke of defendant's background as not being any justification or excuse for defendant's criminal acts. Thus, the record shows that the court carefully considered the mitigating circumstances of defendant's background and their effect upon his present mental capacity but found that these circumstances were not of sufficient mitigating value to render the imposition of the death penalty unreasonable.

Furthermore, the record shows that the court made very thorough findings of fact and made very careful written statements of all of the relevant aggravating and mitigating circumstances. The court's judgment begins with a concise summary of the procedural details of this case:

"This matter came before the court for trial commencing January 9, 1984, with the State of Indiana represented by La-Porte County Deputy Prosecuting Attorney, Craig Braje and Marshall County Prosecuting Attorney, Fred Jones. The defendant was in court in person and represented by counsel, Greg Hofer and Jere Humphrey.

"The trial continued until the date of January 13, 1984, at which time the defendant and the State of Indiana entered into a plea agreement and submitted the same to the court for approval. The plea agreement provided for the reunification of Counts I and II of the Amended Information filed December 1, 1983, which counts had previously been severed for purposes of trial pursuant to the defendant's motion and the court's order.

"The plea agreement further provided for the defendant to plead guilty to:
 COUNT II, ATTEMPTED MURDER
 COUNT IV, MURDER
 COUNT VII, MURDER
 COUNT X, ATTEMPTED MURDER
enumerated in the Amended Information with the remaining charges:
 COUNT I, CHILD MOLESTING

COUNT III, CHILD MOLESTING
COUNT V, FELONY MURDER
COUNT VI, CHILD MOLESTING
COUNT VIII, FELONY MURDER
COUNT IX, UNLAWFUL DEVIATE
CONDUCT

to be dismissed at the completion of sentencing. The plea agreement also reserved the right of the State of Indiana to seek imposition of the death penalty upon Count IV, Murder and Count VII, Murder. The plea agreement was submitted and after hearing thereon at which the defendant was advised of those matters required by law and those matters required by law were addressed by the Court, the pleas of guilty were accepted and judgment of conviction entered thereon. During the submission of the plea agreement, certain evidence was introduced in support of said pleas of guilty to establish a basis in fact, which evidence included the video taped and audio taped confession given by the defendant to the LaPorte County Sheriff's Department during the investigation.

"Sentencing hearing commenced January 18, 1984, and continued through January 19, 1984, at which time evidence was presented and closing arguments made. The evidence introduced at the submission of the plea agreement was requested to be incorporated into the record of the sentencing hearing, which request was granted. Also introduced and incorporated into the record of the sentencing hearing was the record of the competency hearing previously held."

The court then entered extensive findings including his consideration of aggravating and mitigating circumstances on the two attempted murder counts and entered the sentence of two consecutive fifty year terms on those two counts. The court next considered the murder count of D.R. and found that the two aggravating circumstances of murder while committing child molesting and murder committed by lying in wait had been proved beyond a reasonable doubt. The court then set out its lengthy consideration of mitigating circum-

stances and reached the following conclusion:

"Therefore, the court now specifically finds:

"1. That the State of Indiana has proved beyond a reasonable doubt that the defendant, Frank Davis, committed the murder of D.R. on or about June 16, 1983, in the County of LaPorte, State of Indiana, by choking and strangling D.R.

"2. That the State of Indiana has proved beyond a reasonable doubt that the defendant committed the murder of D.R. by intentionally killing D.R. while committing child molesting.

"3. That the State of Indiana has proved beyond a reasonable doubt that the defendant committed the murder of D.R. while lying in wait.

"4. That mitigating evidence was presented to the court but that the aggravating circumstances singularly outweigh any mitigating circumstances presented on behalf of the defendant and that jointly the aggravating circumstances overwhelmingly outweigh any mitigating evidence presented."

The court then imposed the death penalty upon the defendant for the murder of D.R.

Finally, the court considered the murder count of J.L. and found that three aggravating circumstances had been proved beyond a reasonable doubt: murder while committing child molesting, murder committed by lying in wait, and that defendant had previously committed another murder. The court again set out its lengthy consideration of mitigating circumstances and then concluded:

"Therefore, the court now specifically finds:

"1. That the State of Indiana has proved beyond a reasonable doubt that the defendant, Frank Davis, committed the murder of J.L. on or about June 19, 1983, in the County of LaPorte, State of Indiana, by strangulating J.L.

"2. That the State of Indiana has proved beyond a reasonable doubt that the defendant, Frank Davis, committed

the murder of J.L. by intentionally killing J.L. while committing child molesting. "3. That the State of Indiana has proved beyond a reasonable doubt that the defendant committed the murder of J.L. while lying in wait.

"4. That the State of Indiana has proved beyond a reasonable doubt that the defendant committed the murder of J.L. having previously committed the murder of D.R. and knowing that he had previously committed the murder of D.R.

"5. That the mitigating evidence presented to the court is outweighed by any one aggravating circumstance hereinabove enumerated and further that the aggravating circumstances jointly overwhelmingly outweigh any mitigating evidence presented."

The court then imposed the death penalty upon defendant for the murder of J.L. Although we have found that the evidence does not support the aggravating circumstance of committing the murder of J.L. by lying in wait, this erroneous finding of the trial court does not affect the court's imposition of the death penalty on this count since the finding of the other aggravating circumstance which was charged is clearly supported by the evidence, and the court found that the mitigating evidence is outweighed by any one of the aggravating circumstances.

In concluding our review of the imposition of the death penalty in this case, we find that the trial court carefully followed all of the required statutory procedures. At the sentencing hearing, both the defendant and the state presented evidence. The court considered all the evidence presented, the presentence investigation report, and the arguments of counsel before imposing the death penalty. It entered a very thorough written statement of findings and reasons for the imposition of the death penalty in accordance with the requirements of Ind.Code § 35–50–2–9. This written statement shows that the judge considered the specific facts of the instant crimes and the character of defendant. We have reviewed the written findings and rea-

sons along with the evidence in the case and find that the record clearly supports the conclusion that the imposition of the death penalty on the two murder counts was determined by the nature of the offenses and the character of the offender. The evidence supports our conclusion that the sentence of death was not arbitrarily or capriciously arrived at and is not manifestly unreasonable.

The judgment of the trial court is affirmed in all things; the cause is remanded to the trial court for the purpose of fixing a date for the death sentence to be carried out.

GIVAN, C.J., and PRENTICE and PIVARNIK, JJ., concur.

DeBRULER, J., concurs and dissents with opinion.

DeBRULER, Justice, concurring and dissenting.

This court has wisely held that adherence to the statutory and procedural scheme in the death sentencing statute provides a main protection against the arbitrary or capricious imposition of the death penalty. *Williams v. State* (1982), Ind., 430 N.E.2d 759. While the trial court labored well in applying the statute, the final result is colored by two defects. The first is the failure of the evidence to prove the aggravating circumstance of murder by lying in wait in both cases, and the second is the lack of a written form of notice in the record that the first murder of D.R. would be considered an aggravating circumstance in sentencing for the later murder of J.L.

A murder by lying in wait is a murder by ambush. It is a killing while launching a forceful attack from concealment upon an unsuspecting victim. Here, appellant confronted D.R., before employing force, and did not launch his attack upon J.L. from concealment. This is not murder by ambush.

The trial court imposed death for the murder of J.L., on the basis of the prior murder of D.R., even though there was no writing in the record evidencing the intent

of the prosecution to utilize that prior murder as an aggravating circumstance. In *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, this court sanctioned the death sentence where a second count for murder alleged the distinctive elements of an aggravating circumstance and was marked with a citation to the death sentence statute. The intent to prove that aggravating circumstance was clear on the face of the pleadings. Here, the pleadings do not have this distinctive character. *Brewer* does not sanction the *sua sponte* determination of uncharged aggravating circumstances that may be shown by the evidence in the death hearing, and I regard a determination of that character to be clear error.

I concur with the majority, wherein it concludes that there was sufficient evidence to warrant the determination of the trial court to a moral certainty beyond a reasonable doubt of the aggravating circumstance that appellant killed both D.R. and J.L. while committing a requisite felony. The pleadings adequately reflected the intent to seek the death penalty upon the basis of this aggravating circumstance as required by the death statute.

In light of the view I take of this case, the next question to present itself is whether, in light of the above departures from the statute, to permit the death sentence in each case to stand upon the sole remaining aggravating circumstance, or to require a fresh determination of the sentence. On the one hand, the trial judge appears to say that in evaluating the relative weight of mitigating and aggravating circumstances he weighed each individual aggravating circumstance against the mitigating circumstances and concluded that each alone outweighed all mitigating circumstances. It could be persuasively argued that this process was benign and sufficient. On the other hand, that process is outside the statutory scheme. The statute requires the enumerated aggravating circumstances to be weighed together. The statute thus implicitly requires a resentencing where one of several aggravating circumstances is set aside on review, since the relative weight of the remaining aggravating circumstances or circumstance as against mitigating circumstances could not be known. Beyond the statutory contemplation of the weighing process, the process employed by the trial court was conducted under an assumed set of circumstances and an assumed duty, and without the knowledge of this court's views of the legal problems involved. This element of artificiality detracts from the confidence one might have in the results of the trial court's tests.

There is another irregularity in the court's written findings which further erode the confidence which one might repose in the conduct of the final weighing process. I.C. § 35–50–2–9(g) provides:

"If the hearing is to the court alone, the court shall sentence the defendant to death only if it finds:

(1) that the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances exists; and

(2) that any mitigating *circumstances* that exist are outweighed by the aggravating circumstance or circumstances." (emphasis added)

In writing the death sentence order, more fully set out in the majority opinion, the trial court in describing the process that he went through in conducting the final weighing process required by the above provision, stated that, ". . . the aggravating circumstances overwhelmingly outweigh any mitigating *evidence* presented", and ". . . That the mitigating *evidence* presented to the court is outweighed by any one aggravating circumstance hereinabove enumerated and further that the aggravating circumstances jointly overwhelmingly outweigh any mitigating *evidence* presented." At this final weighing stage evidence has no weight whatever. Only circumstances, involving historic fact adjudged by the court to have existed, can have mitigating value. While I believe, based upon the order as a whole, that the trial judge is well aware of the distinction between evidence on the one hand and circumstance or fact on the other, I am uncertain whether or not

at this critical juncture, the use of the term "evidence" was a simple slip, or was accurate. Based upon these apparent departures from the required statutory procedures, I can only conclude that the benefits of remand for resentencing clearly outweigh the costs in all categories of remand, and therefore vote for remand and resentencing for both homicides.