Frank DAVIS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 50S00–9008–PD–539.

Supreme Court of Indiana.

Dec. 31, 1996.

Susan K. Carpenter, Kenneth L. Bird, Ann M. Pfarr, Eric K. Koselke, Indianapolis, for appellant.

Pamela Carter, Attorney General of Indiana, Thaddeus Arthur Perry, Deputy Attorney General, Indianapolis, for appellee.

SHEPARD, Chief Justice.

## I. Introduction

In his post-conviction appeal, appellant Frank R. Davis alleges that ineffective assistance of counsel prompted him to plead guilty to two counts of murder and two counts of attempted murder. He also alleges his guilty plea was not intelligent or voluntary. The post-conviction court held otherwise, and we affirm.

## II. Statement of the Facts

Davis was arrested following separate assaults on four teenaged boys in northern Indiana over a six-month period in 1983. The State's evidence showed that he molested and attempted to murder one fifteen-year-old boy by hitting him repeatedly in the head with a handgun in January 1983. Six months later, he molested another teenage boy before choking him to death. Two days after that, he befriended two more teenaged boys who were camping. He forced one youth who had been sleeping outside the tent to accompany him to a set of nearby railroad tracks. Along the tracks, he molested the boy and strangled him with a piece of wire. Davis returned to the campsite and told the other youth his friend had been hurt. The youth followed Davis back to the railroad tracks where Davis, at knife point, tied the youth's hands with wire and performed oral sex on him. Then he told the boy to roll over onto his stomach and hit him in the head with an axe four times. The youth lost consciousness but survived to tell police later that a man named Frank Davis had harmed him. Davis was arrested on June 21, 1983 and told police about his involvement in all four crimes.

On July 13, 1983, the State charged Davis with ten criminal counts, and asked for the death penalty. Davis initially planned an insanity defense, but "thirty seconds" before the trial started his defense counsel withdrew the insanity defense. That decision left him without any defense at all. The next day Davis told his lawyer he wished to plead

guilty. As part of an agreement, he pled guilty to two counts of murder[1] and two counts of attempted murder, a class A felony.[2]

Twelve days later, the trial court sentenced Davis to death for murder and imposed two consecutive fifty-year sentences for the attempted murder convictions. On direct appeal, we affirmed. *Davis v. State*, 477 N.E.2d 889 (Ind.1985), *cert. denied*, 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475. In early 1986 Davis filed a petition for post-conviction relief. The State disputed the allegations in the motion and argued he should have sought relief on direct appeal. After two amendments to Davis' petition, the trial court opened a postconviction relief hearing on November 10, 1993.

The hearing terminated when the court approved a Joint Motion for Equitable Relief. Under its terms, the post-conviction court vacated Davis' death sentence but not the two fifty-year sentences. It determined that the sentencing hearing would be reopened "for the sole purpose of entering additional mitigating evidence. There are no restrictions on the penalties that may be given." (R. at 278.)[3] The only issue remaining was Davis' request to withdraw his guilty plea, which the post-conviction court denied.

## III. Statement of the Issues

Davis advances two arguments in support of his request to withdraw his guilty plea.

First, Davis argues his lawyer rendered ineffective assistance by forcing him to forego a jury trial and waive his constitutional rights in exchange for a plea agreement that gave him no real benefit. Specifically, he argues his counsel lacked the experience to handle a death penalty case, allowed an incompetent defendant to plead guilty, failed to suppress statements and the fruits of an illegal search of the Davis family home, failed to prepare and present an insanity defense, and allowed Davis to plead guilty without the requisite intent. Finally, Davis argues his counsel failed to advise him on the aggrava-

---

1. Ind.Code Ann. § 35–42–1–1 (West 1986).

2. Ind.Code Ann. § 35–41–5–1 (West 1986), § 35–42–1–1 (West 1986).

3. References to the post-conviction record are denoted by the letter "R." The record of the guilty plea is denoted by "G.R."

ting circumstances and failed to voir dire the jurors properly.

Second, Davis argues that his plea was not voluntary and intelligent. In particular, Davis alleges his plea was invalid because during the plea hearing he denied an intent to kill until after an off-the-record conference, received incorrect advice about the aggravating circumstance that would apply to the case, pled guilty to what the defense called an "illusory plea," and was not properly informed about the role of the jury in evaluating the appropriateness of the death penalty. Finally, Davis alleges he was not sufficiently competent to enter a guilty plea.

## IV. Ineffective Assistance of Counsel

■ In reviewing the denial of a petition for post-conviction relief, we do not reweigh evidence or judge the credibility of the witnesses. To prevail, a petitioner must establish that the evidence as a whole leads unmistakably to a decision in his favor. *Schiro v. State,* 479 N.E.2d 556 (Ind.1985), *cert. denied,* 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986).

■ Defendants who challenge the quality of their legal defense face a demanding two-part test. First, the defendant must show that the attorney's performance fell below an objective standard. Second, the defendant must show the attorney's performance was so deficient and prejudicial that the defendant was denied a fair trial. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Whatley v. State,* 508 N.E.2d 537 (Ind.1987). Indiana courts have required strong and convincing evidence to overcome the presumption of effective defense counsel. *Terry v. State,* 465 N.E.2d 1085, 1089 (Ind.1984). "Isolated poor strategy, bad tactics, a mistake, carelessness or inexperience do not necessarily amount to ineffective counsel unless, taken as a whole, the defense was inadequate." *Id.,* citing *Hollon v. State,* 272 Ind. 439, 398 N.E.2d 1273 (Ind.1980).

■ Davis' lead attorney, George Hofer, had just two years experience, but he had worked as both a deputy prosecutor and a public defender. Hofer had only slim experience with jury trials, none of them a capital case, but he was aided by an experienced co-counsel, Jere Humphrey. Humphrey, who assisted with jury selection, had handled several capital cases. Hofer was also astute enough to argue that the charged aggravator of lying-in-wait did not apply to Davis' case. This Court later agreed with Hofer and held that the trial court erred when it found the lying-in-wait aggravator was supported by the evidence. *Davis,* 477 N.E.2d at 897. As the post-conviction court noted, "viewing the case as a whole, the Trial Counsel were competent." (R. at 269.)

Hofer conceded at the post-conviction hearing that he was "overwhelmed" by the case. Much of his anxiety appeared to have stemmed from the Davis' failure to cooperate with his defense, however, rather than from his inability to handle the legal issues involved.

At the post-conviction hearing, Hofer acknowledged that even with the experience he had gained since Davis' original trial, he did not believe he could have been able to obtain Davis' cooperation. Hofer recalled Davis' answering his lawyers' questions with statements such as "Well, you find out" or "you get the answer" or "that's your job." (R. at 433.) Ultimately, it was the defendant's behavior, not his counsel's representation, that hampered the defense. It is hard to see, therefore, how the attorney's conduct fell below prevailing standards required by *Strickland.*

■ Davis also argues he was denied effective assistance of counsel because his lawyer allowed him to plead guilty even though he was incompetent. Testimony obtained four years after the conviction showed Davis suffered brain damage during birth that caused his right brain to function less effectively than his left. As a result of this injury and the odd behavior it produced, he was placed in Beatty Hospital at age fourteen. During his time at Beatty, testimony showed he was placed in an adult ward where he was sodomized and abused for his entire one-year commitment. Due to this traumatic abuse, a physician testified, Davis suffered from post-traumatic stress disorder, borderline personality disorder, and major features of anti-

social personality disorder. (R. at 658.) As a result of these problems, a physician testified, a criminal defendant might have trouble cooperating with his counsel.

This evidence contradicts, however, the evidence available to Davis' trial counsel. According to the guilty plea record, psychiatric examinations had found Davis competent (G.R. 637–38,653–54), and even Humphrey thought Davis was competent to stand trial. (R. at 728). Faced with this evidence, Hofer and Humphrey opted to drop the insanity defense just before the trial started. Under the *Strickland* standard, counsel's decision to allow Davis to plead, especially in light of the evidence, appears reasonable.

■ Davis also argues that because of the ineffective work of his counsel, there was no attempt to suppress evidence of his statement to police. With respect to the suppression of Davis' admission he committed the crimes, counsel testified that he believed the State had promised to forego the death penalty charge in exchange for Davis' confession. (R. at 329.) Counsel also said the deputy prosecutor trying the case told him there was no such promise. Despite the conflict in evidence, trial counsel did not ask the county prosecutor to testify at the suppression hearing. The contradictory statements about the link between the death penalty and the confession, however, shows that the record does not inevitably lead to the conclusion that such a promise existed. Even if counsel raised this issue during the suppression hearing, it is not clear he would have prevailed.[4]

■ Davis also claims ineffective assistance with respect to suppression of the results of a search of the Davis family's home. At the suppression hearing, a police officer testified he told Davis' family he had a warrant to search Davis' room. A family member told him that if he was going to search that room he would search the entire house anyway, so he gave him his consent. Even without a search warrant, the consent given by the family member would have validated a search of the home by police officers. "The

consent to search is a valid exception to the search warrant requirement under Indiana law." *Hill v. State,* 267 Ind. 480, 487, 371 N.E.2d 1303, 1307 (Ind.1978). Davis suggests that duress was applied to the Davis family in order to obtain consent, but the record reveals no evidence of duress. There is no showing of ineffective assistance on this score.

■ Davis also argues that his lawyers were ineffective for failing to prepare and present an insanity defense. He finds this particularly egregious because of the later discovery of his childbirth brain injury. As noted above, however, there was substantial testimony suggesting Davis was indeed sane. For the post-conviction court, there was enough evidence in the record to support a conclusion Davis was sane when he committed the acts.

■ The record also shows Davis' counsel made a substantial effort to prepare an insanity defense. In the moments before the trial began, however, they elected to abandon the defense in order to keep some of the more unsavory aspects of Davis' past from the jury. (R. at 349.) Trial strategy decisions rest only with counsel and a choice of tactics rarely sustains an ineffective assistance claim. *See Adams v. State,* 575 N.E.2d 625, 629 (Ind.1991). In light of the evidence of sanity before the postconviction court and the reasoned decision to drop the insanity defense by Davis' counsel, it is apparent the *Strickland* standard has not been met.

■ Davis also alleges that Hofer advised him to plead guilty even though he never admitted committing the crimes. An Indiana defendant must admit the offense to which he is pleading guilty. *Patton v. State,* 517 N.E.2d 374, 375–76 (Ind.1987), *aff'd after remand,* 588 N.E.2d 494 (Ind.1992). Davis states Hofer suggested he plead guilty even though Davis told him he would not say he intentionally committed the crimes. By urging him to plead guilty under these circumstances, Davis argues, his defense team was

---

4. The post-conviction court made a finding that implicitly rejects Davis' claim that the State promised to forego its death penalty request: "After Defendant proceeded to plead guilty,

counsel did advise him that they believed that with a guilty plea his odds of not getting the death penalty were better with a judge that with a jury." (R. at 267.)

aware the plea would not meet the requirements for a guilty plea.

A review of the record reveals that Davis, albeit reluctantly, admitted to the attempted murder in January, and the second attempted murder count in June. It also shows he admitted intentionally killing the two youths in June. (G.R. at 567–68.) In light of Davis' own testimony, it appears obvious that a sufficient factual basis existed for the guilty plea and that counsel's conduct was not deficient.

■ Davis also argues that his counsel inadequately advised him on how to respond to the aggravating factors charged under the death penalty statute. There is evidence in the record, however, that Hofer and Davis discussed the aggravating factors. Indeed, as noted earlier, Hofer's legal theory that at least one of the aggravators, lying in wait, did not apply was found to be correct. *Davis*, 477 N.E.2d at 897. In light of the discussions and our later decision it is hard to understand Davis' claim his counsel was ineffective.

■ Finally, with respect to his ineffective assistance claims, Davis argues that his counsel failed to voir dire the jury adequately. However, the defense team had interviewed the jury enough to know how it might view capital punishment. In fact, one member of the defense team described it as a "hanging jury." (R. at 730). In any event, the composition of the jury appeared to have little impact on Davis. According to Humphrey, one reason Davis decided to plead guilty was to spare his family any pain, not because he felt the jury was against him. Even if voir dire was inadequate, it is not clear that failure to conduct proper voir dire by itself prompted the guilty plea by making it seem to Davis he had no other choice but to plead.

## V. Guilty Plea Was Knowing and Voluntary

Davis argues his guilty plea was not knowing and voluntary due to ineffective assistance of counsel. He claims the record shows he denied an intent to kill and that the advice he received at his trial was insufficient to allow him to make an intelligent and voluntary decision about pleading. He argues this failure in advice meant he was improperly advised about the aggravating circumstances that would apply to his case. Further, he argues, the breakdown in advice from counsel led him to an "illusory plea" which gave him no real benefit. Finally, Davis argues he was not competent to enter a plea voluntarily and intelligently.

■ A guilty plea constitutes a waiver of constitutional rights and this waiver requires a trial court to evaluate the validity of every plea before accepting it. *Butler v. State*, 658 N.E.2d 72, 75 (Ind.1995), citing *Stowers v. State*, 266 Ind. 403, 363 N.E.2d 978 (Ind.1977). For the plea to be valid, the defendant's decision to plead guilty must be knowing, voluntary and intelligent. *Boykin v. Alabama*, 395 U.S. 238, 242–44, 89 S.Ct. 1709, 1711–13, 23 L.Ed.2d 274 (1969). In *Boykin*, the U.S. Supreme Court noted: "What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and its consequences." *Id.* at 243–244, 89 S.Ct. at 1712. Indiana's guidelines on this issue predate the U.S. Supreme Court's holding. "[L]ong before the leading federal cases on guilty pleas, Indiana courts recognized that fundamental fairness required something more than a docket sheet notation that the defendant appeared and pleaded." *White v. State*, 497 N.E.2d 893, 896 (Ind. 1986).

Indiana law specifies that a trial court shall not accept a plea of guilty or guilty-but-mentally-ill without first determining that the defendant understands the nature of the charges against him and that pleading guilty waives a number of valuable constitutional rights. Ind.Code Ann. § 35–35–1–2 (West 1986).

■ Davis argues specifically his guilty plea is invalid because at the guilty plea hearing he initially denied he had an intent to kill. (G.R. at 562–64.) To establish a factual basis for the plea agreement, Humphrey asked Davis a series of questions

about the crimes. Initially, Davis said he did not know what he was doing when he killed Darrin Reed. (G.R. at 564). It was only after an off-the-record conference that he testified he intended to kill the two youths and intended to kill two others. (G.R. at 566–68.) With respect to each crime, Davis admitted he intended to murder the two boys and intended to attempt to murder the two others. (G.R. at 566–68.) In *Underhill v. State,* 477 N.E.2d 284, 287 (Ind.1985), this Court held that a defendant's admission of the facts outlined before the trial court sufficed to establish a basis for the entry of a plea. Similarly, Davis' admission at his guilty plea hearing and the introduction by the prosecutor of audio tapes of Davis' confession to police established a sufficient factual basis for the guilty plea.

Davis also argues his plea should be withdrawn due to the advice he received from counsel and his knowledge about the consequences of a guilty plea when he made the decision to plead. Specifically, he asserts that his counsel failed to advise him properly on the charged aggravating circumstances. Davis argues when he pled guilty, he had "more than the mere expectation he would receive a term of years. He believed he could not receive the death penalty because the aggravating circumstances did not apply to his case." (Appellant's brief at 62). Davis also argues that the trial court did not correct any misunderstanding he had.

There is ample evidence in the record, however, to show that Davis and his counsel discussed the aggravating circumstances. As noted above, Davis' counsel succeeded in getting one of the aggravating circumstances reversed. *Davis,* 477 N.E.2d at 897. Also, Davis' counsel never said the "intentional murder in the course of a felony" aggravator would not apply. He only said he would try to argue against it.

■ Davis also argues he pled guilty to what amounted to an "illusory plea." As part of the plea agreement, Davis pled guilty to two counts of murder and two counts of attempted murder. In exchange, the State agreed to drop two counts of felony murder and four counts of deviate sexual conduct. He argues there was no real benefit to the plea since the trial court still had the option under the plea agreement to impose the death penalty. Counsel asserts the bargain was meaningless because the doctrines of double jeopardy and merger would have prevented the convictions and sentences on all ten counts as alleged. *Eddy v. State,* 496 N.E.2d 24 (Ind.1986) (one may not be convicted and sentenced for both felony murder and the accompanying felony of robbery). Davis also cites *Daniels v. State,* 531 N.E.2d 1173 (Ind.1988), for the proposition that a guilty plea is invalid if induced by the fear of greater punishment than would have been legally possible. In this case, however, Davis pled guilty after his defense counsel made a calculated decision that he would be less likely to receive the death sentence if he did so. His plea was not induced by a fear of greater punishment than was legally possible. Even with a guilty plea, the death penalty was still legally possible.

■ Finally, with respect to the advice he received about the plea agreement, Davis argues the pleas should be set aside because the trial court simply read the death penalty statute to him but did not explain the special role the jury plays in evaluating the appropriateness of the death penalty. Davis is correct in asserting that *Boykin* requires a conviction to be vacated unless the defendant knows or is advised at the time of his plea that he was waiving his right to a jury trial. Davis *was* advised he was waiving his right to a jury trial. He may not have been specifically told he was also waiving the *opportunity* to have a jury consider whether it would recommend that death penalty, as required by Ind.Code Ann. § 35–50–2–9(d) (West 1986). However, *Boykin* establishes only that the U.S. Constitution requires that a defendant be advised of his right to a trial by jury, the right to confront one's accusers and the right against self-incrimination. By foregoing the opportunity for a jury to make a recommendation on his sentence, Davis was not giving up a constitutional right that would require a separate advisement.

■ Finally, Davis alleges he was not sufficiently competent to enter a guilty plea voluntarily and intelligently. As has been

noted earlier, however the post-conviction court found there was sufficient evidence to determine that Davis was competent to stand trial and consequently participate in his guilty plea hearing. To prevail on appeal, a petitioner must establish that the evidence as a whole leads unmistakably to a decision in his favor. *Schiro v. State*, 479 N.E.2d 556 (Ind.1985), *cert. denied*, 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986). Davis has not met this burden.

### VI. Conclusion

For the foregoing reasons, the decision of the post-conviction court to deny Davis' request to withdraw his guilty plea is affirmed.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.