## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 21 2020, 11:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Amy E. Karozos
Public Defender of Indiana

Emilee A. Grubb
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Charles E. Barber,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

December 21, 2020

Court of Appeals Case No.
20A-PC-1164

Appeal from the Marshall Superior Court

The Honorable Robert O. Bowen, Judge

Trial Court Cause Nos.
50D01-1606-PC-1
50D01-1801-PC-1
50D01-1801-PC-2

**Brown, Judge.**

[1] Charles E. Barber appeals the denial of his petitions for post-conviction relief. We affirm.

*Facts and Procedural History*

[2] On October 23, 1977, the State charged Barber with three counts of forgery as class C felonies as Counts I, II, and III, and three counts of theft as class D felonies under cause number SCR 77-60 ("Cause No. 60"). On February 3, 1978, the court held a hearing at which Barber was represented by counsel. During the hearing, Barber provided his name and age, indicated he entered a plea agreement, understood his rights, and had no questions about the plea agreement, and pled guilty to Counts I, II, and III. On March 1, 1978, the court sentenced Barber to concurrent sentences of two years for each count.

[3] On August 29, 1982, the State charged Barber with receiving stolen property as a class D felony under cause number SCR 82-46 ("Cause No. 46"). On October 20, 1982, the court held a guilty plea hearing. Barber provided his name and age, indicated his attorney discussed the charge with him and he understood his rights, and, when asked if he had any questions about the plea agreement and if he understood it, he answered: "Yeah. I understand it." Exhibits Volume at 87. Barber's counsel asked the court for permission for Barber to travel to the hospital where his daughter was going to be having an operation. Barber explained that his daughter was having an operation for a hernia, the doctor told him and his wife that it would be better "to get her in there while she's young because she's got asthma." *Id.* at 90. Upon questioning by the court, Barber explained that his wife could not "handle an operation on

her little girl," that he and his wife could not have more children, he would like to be present, and the operation had not been scheduled. *Id.* at 91. On November 17, 1982, the court held a sentencing hearing at which Barber indicated he did not understand the presentence investigation report. After a bench conference, Barber answered affirmatively when asked if he had difficulty reading, and indicated his counsel read the document to him and that he understood it and his rights. Barber asked what would happen if he did not plead guilty, and the court informed him that he would go to trial. Barber asked: "I mean, like a Jury Trial; right?" *Id.* at 111. The court answered: "You would go to a Jury Trial; that is correct." *Id.* Barber stated: "I ain't got nothing else to say." *Id.* After further questioning, the court stated it was satisfied that Barber had made a knowing and conscious choice to plead guilty. When asked about his highest level of education, he answered: "Ninth." *Id.* at 112. The court asked, "Ninth grade?" *Id.* Barber answered: "Yeah, but I was in special education." *Id.* The court sentenced him to four years with two years suspended to probation.

[4]   In 2012, the State charged Barber with sexual misconduct with a minor as a class B felony and alleged that he was an habitual offender under cause number 50D01-1210-FB-58 ("Cause No. 58"). On August 15, 2013, the court held a hearing at which Barber was represented by counsel. Barber indicated he understood his rights, answered affirmatively when asked if his mind was free and clear, pled guilty, and admitted to the allegations in the habitual offender enhancement. The court sentenced him pursuant to the plea agreement to

fifteen years and enhanced the sentence by ten years for his status as an habitual offender for an aggregate sentence of twenty-five years.

[5] On June 20, 2016, Barber filed a *pro se* petition for post-conviction relief regarding Cause No. 58, and the court indicated that the petition corresponded with cause number 50D01-1606-PC-1 ("Cause No. 1606-PC-1"). On January 10, 2018, Barber filed a *pro se* petition for post-conviction relief regarding Cause No. 60, which the court indicated corresponded with cause number 50D01-1801-PC-1 ("Cause No. 1801-PC-1"), and a *pro se* petition for post-conviction relief regarding Cause No. 46, which the court indicated corresponded with cause number 50D01-1801-PC-2 ("Cause No. 1801-PC-2"). On August 7, 2018, Barber by counsel filed amended petitions in Cause Nos. 1801-PC-1 and 1801-PC-2. On February 28, 2019, Barber by counsel filed an amended petition in Cause No. 1606-PC-1.

[6] On March 12, 2020, the court held a consolidated evidentiary hearing. Attorney Jere Humprey, Barber's counsel in 1982, testified and, when asked if he had any recollection of Barber's case, he answered: "None at all." Transcript Volume II at 6. On cross-examination, when asked if it would have been his regular practice to examine his clients and evaluate their competency, he answered that "it wouldn't have just been by looking at somebody" and he also would have looked at the offense and the defendant's explanation. *Id.* at 7. When asked if he would have done that with Barber, he answered affirmatively.

[7] On cross-examination, Attorney Joseph Simanski, Barber's counsel in Cause No. 58, testified that competency is an issue in all cases and that "in the course of representing clients, I have made a decision that that needed to be explored as to whether they were competent or able to understand the nature of the charges and – and what the proceedings involved." *Id.* at 11. When asked if he was familiar with the competency request and the process, he answered: "Absolutely. I've been through that on a number of occasions." *Id.* He testified that he was certain he had several conversations with Barber during the course of his representation and did not believe he had a problem with Barber "understanding whatever I needed to advise him." *Id.* at 12. He indicated that he went over the terms of the plea agreement with Barber. On redirect examination, he stated "there were no signals or red flags or anything when I was speaking with him and explaining – whether we were talking about the evidence or whether we were talking about trials or whether we were talking about the proposed agreement." *Id.* at 14.

[8] Dr. James Cates, a clinical psychologist, testified that he reviewed documents from the Social Security Administration and met with Barber. He testified he administered the Wechsler Adult Intelligence test and Barber's "actual scores fell in the upper end of the extremely low range and basically what that means is that he is falling below ninety nine (99) percent of the population in terms of

his intellectual ability."[1]  *Id.* at 27.  When asked what that meant in relation to Barber's ability to understand the proceedings against him and to assist in his attorney's defense, he answered:

> In and of itself it's a red flag.  I would not take that information in isolation and say he's incompetent, but it begins to suggest to me that if he were to be competent he would need extra time, a lot of extra work, a lot of extra explanation, a lot of hand holding to get through anything if he were really going to be competent and then I would has [sic] significant questions and that's where the rest of the testing comes in.

*Id.*

[9]     With respect to the wide range achievement test, which was a screening measure of reading, arithmetic, and written language skills, Dr. Cates testified Barber's scores were consistently below kindergarten level.  He also testified that Barber's score on the Vineyard Adaptive Behavior Scales, which measures his activities of daily living, socialization skills, and ability to communicate with other people, was significantly low and "functioning below ninety nine

---

[1] When asked what the Wechsler Adult Intelligence test measures, he answered:

> It's a series of ten (10) sub tests.  They measure – they measure general intelligence.  Um, they are most predictive of academic ability, um, and skills that are related to academic ability, but they measure verbal comprehension, the ability to understand verbal information.  They measure perception organization, ah, visual spatial, visual constructional skills, ability to analyze the divisional environment.  They measure processing speed, the ability to, um, take information and rapidly use it in visional motor form and they measure working memory, the ability to take information in memory and retain it in short term.

Transcript Volume II at 26.

(99) percent of the population in these areas." *Id.* at 30. He testified that the McArthur Competency Assessment measured Barber's "understanding of the actual charges that are pending or were occurred against him," and that he was "well within the range of people who were found not competent" and was "[c]learly not competent to stand trial." *Id.* at 31-32. He testified he did not believe Barber was competent when he pled guilty in 1978, 1982, or 2013.

[10] On cross-examination, when asked if Barber's employment indicated he was able to function at some level, Dr. Cates stated: "I never suggested that [Barber] was so incompetent he could not function at some level." *Id.* at 41. When asked if he was aware Barber suffered a stabbing injury to his head, he answered that he believed so. Dr. Cates's report mentioned that Barber experienced a stroke in December 2017, and he testified that there is a test to measure the impact of a stroke but that he was not qualified to administer neuropsychological testing for that purpose. He also indicated he had not talked to anyone who had known Barber before his stroke. On redirect examination, he answered affirmatively when asked: "So despite a possible concussion or head trauma, the stroke, the knife in the head are Barber's evaluations, because there were several historically, consistent with the one that you did?" *Id.* at 59. He also testified that Barber did not tell him how he made his filings prior to obtaining post-conviction counsel. When asked if it would be his hypothesis that Barber has someone write documents for him and he signs them, he answered: "I would assume that that's how it works, yes." *Id.* at 61.

[11]     Upon questioning by the court in reference to Dr. Cates's report, the following exchange occurred:

> Q . . . . It's toward the end, "[Barber] also lacked and appreciated for what occurred in his own trial. Perhaps the most telling comment was made when he said he felt his own attorney was not helpful to him. When asked the reason he said "he just said come back and told me to take this and go with it. That's the best you're going to get and I didn't even understand what he was talking about". That happened – that statement was made to you when you were doing this report?
>
> A That's correct.
>
> Q So that was about five (5) years after the plea agreement; right?
>
> A That's correct.
>
> Q And you said he has a bad memory, so how can I trust what he says right there? If I can? I know you're just reporting it.
>
> A It becomes the difficult place of having Mr. Barber make an allegation against his attorney which I feel some obligation to at least report. Whether I place any emphasis or wait [sic] on that is an entirely different matter, but I still feel the need to put it in writing and make it available to people to do with what they will.

*Id.* at 63. When asked by the court if he had looked at any of the court documents such as the plea agreement and sentencing orders, he answered: "In this case, no. In lots of cases, sure." *Id.* at 64. After the court explained the general questioning of a defendant accepting a guilty plea, Dr. Cates stated: "Your Honor, I guess he's a difficult ca – I mean, there are people who are clearly not competent and there are people who are clearly competent and then

we have the Mr. Barbers who are right there on the line." *Id.* at 65. Dr. Cates later stated: "You know, not having been here and not having heard – not having a transcript of it, not – I just – I hesitate to start pontificating on that, so – ." *Id.* at 66. On redirect examination, Dr. Cates indicated that Barber has a nature to please and seek approval which could play a part in his acquiescence during a sentencing or plea hearing.

[12] The prosecutor moved to admit Exhibits H and I, which "relate to the 77 case indicating that two (2) of my witnesses are deceased for the defense of laches," and Exhibit J, which "is for the 82 case indicating (inaudible) witness is deceased." *Id.* at 69. Barber's counsel had no objection, and the court admitted them and also took judicial notice of its file in each case.

[13] On May 20, 2020, the court denied Barber's petitions in an order which adopted and incorporated the State's proposed findings of fact and conclusions of law.

## *Discussion*

[14] Generally, the petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the

post-conviction court. *Id.* "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses.[2] *Id.*

[15] Barber argues reversal is required because: (A) his due process rights were violated when he pled guilty while incompetent; and (B) he was denied effective assistance of trial counsel when counsel failed to raise the issue of competency.[3]

A. *Due Process*

[16] Generally, a guilty plea constitutes a waiver of constitutional rights and this waiver requires a trial court to evaluate the validity of every plea before

---

[2] To the extent the post-conviction court adopted the State's findings, we note that the Indiana Supreme Court has held:

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority of our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court.

*Prowell v. State*, 741 N.E.2d 704, 708-709 (Ind. 2001). Barber does not assert that the post-conviction court's adoption of the State's proposed findings and conclusions was improper.

[3] Barber also argues that the doctrines of laches and res judicata, which the post-conviction court referenced, are not applicable. Even assuming that laches and res judicata do not apply, we cannot say that reversal is warranted as explained below.

accepting it. *Davis v. State*, 675 N.E.2d 1097, 1102 (Ind. 1996). For the plea to be valid, the defendant's decision to plead guilty must be knowing, voluntary and intelligent. *Id.* (citing *Boykin v. Alabama*, 395 U.S. 238, 242-244, 89 S. Ct. 1709, 1711-1713 (1969)). A competency hearing is required only when there is evidence before the trial court that creates a reasonable and bona fide doubt as to the defendant's competency. *Evans v. State*, 489 N.E.2d 942, 948 (Ind. 1986).

[17] Due process precludes trying a defendant while he is incompetent. *Gross v. State*, 41 N.E.3d 1043, 1047 (Ind. Ct. App. 2015) (citing *State v. Davis*, 898 N.E.2d 281, 284 (Ind. 2008)). "The test for determining competency in Indiana is whether the defendant 'has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding, and whether the defendant has a rational as well as a factual understanding of the proceedings against him.'" *Id.* (quoting *Davis*, 898 N.E.2d at 284 (quoting *Adams v. State*, 509 N.E.2d 812, 814 (Ind. 1987)).

[18] The Indiana Supreme Court has held that a plea entered after the trial judge has reviewed the various rights which a defendant is waiving and made the inquiries called for by statute is unlikely to be found wanting in a collateral attack. *State v. Moore*, 678 N.E.2d 1258, 1265 (Ind. 1997), *reh'g denied*, *cert. denied*, 523 U.S. 1079 (1998). However, defendants who can show that they were coerced or misled into pleading guilty by the judge, prosecutor or defense counsel will present colorable claims for relief. *Id.* at 1266. In assessing the voluntariness of the plea, we review all the evidence before the court which heard his post-conviction petition, including testimony given at the post-

conviction hearing, the transcript of the petitioner's original sentencing, and any plea agreements or other exhibits which are a part of the record. *Id.* In *Moore*, the Court held that "[v]oluntariness is also distinct from ineffective assistance of counsel, despite some references in our cases to pleas as involuntary" and that voluntariness "focuses on whether the defendant knowingly and freely entered the plea, in contrast to ineffective assistance, which turns on the performance of counsel and resulting prejudice." *Id.*

[19] The record reveals that Barber conversed with the court in Cause No. 46 regarding his request to travel to the hospital for his daughter's operation and was responsive to the court's questions during the hearings in Cause Nos. 60, 46, and 58. Attorney Simanski, Barber's counsel in Cause No. 58, testified that he did not believe he had a problem with Barber "understanding whatever I needed to advise him." Transcript Volume II at 12. While Dr. Cates testified he did not believe Barber was competent when he pled guilty in 1978, 1982, or 2013, he also testified that he was not qualified to administer testing to determine the impact of Barber's stroke and had not examined any of the court documents including the plea agreements, sentencing orders, or transcripts. He also stated: "Your Honor, I guess he's a difficult ca – I mean, there are people who are clearly not competent and there are people who are clearly competent and then we have the Mr. Barbers who are right there on the line." *Id.* at 65. Barber does not specifically challenge the post-conviction court's finding that he appreciated the wrongfulness of his conduct in Cause No. 60 because he created an elaborate story as to how he came to be in possession of the checkbook. The

post-conviction court also concluded that it was unlikely that Dr. Cates could make an informed opinion regarding his mental capacity without certain information. We cannot say Barber has demonstrated reversal is warranted on this basis.

B.  *Ineffective Assistance*

[20]  To prevail on a claim of ineffective assistance of counsel a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *Id.* To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001).

[21] Because Barber was convicted pursuant to guilty pleas, we analyze his claims under *Segura v. State*, 749 N.E.2d 496 (Ind. 2001). *See Barber*, 141 N.E.3d at 42. *Segura* categorizes two main types of ineffective assistance of counsel cases. *Smith v. State*, 770 N.E.2d 290, 295 (Ind. 2002). The first category relates to "an unutilized defense or failure to mitigate a penalty." *Willoughby v. State*, 792 N.E.2d 560, 563 (Ind. Ct. App. 2003), *trans. denied*. The second relates to "an improper advisement of penal consequences." *Id.* Barber's claim falls under the first category. To establish a claim of ineffective assistance of trial counsel following a guilty plea where the alleged error is one that would have affected a defense, the petitioner must show a reasonable probability of success on the merits. *Segura*, 749 N.E.2d at 503. In other words, to show prejudice, Barber must prove that "a defense was indeed overlooked or impaired and that the defense would have likely changed the outcome of the proceeding." *Maloney v. State*, 872 N.E.2d 647, 650 (Ind. Ct. App. 2007).

[22] While Attorney Humprey, Barber's counsel in Cause No. 46, did not recall Barber's case from 1982, he indicated it would have been his regular practice to examine the person, the offense, and the defendant's explanation in evaluating whether a client was competent and that he would have done so with Barber. Attorney Simanski, Barber's counsel in Cause No. 58, testified that he did not believe he had a problem with Barber "understanding whatever I needed to advise him" and that "there were no signals or red flags or anything when I was speaking with him and explaining – whether we were talking about the evidence or whether we were talking about trials or whether we were talking

about the proposed agreement." Transcript Volume II at 12, 14. In light of the record, we cannot say that Barber has demonstrated that the performance of his trial counsel in Cause Nos. 60, 46, or 58 was deficient in overlooking a defense or that the defense, if raised, would have likely changed the outcome of the proceedings.

[23] For the foregoing reasons, we affirm the denial of Barber's petitions for post-conviction relief.

[24] Affirmed.

Vaidik, J., and Pyle, J., concur.