# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**LAWRENCE D. NEWMAN**
Newman & Newman, P.C.
Noblesville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JESSE R. DRUM**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

STACEY D. COX,                              )
                                            )
    Appellant-Defendant,                    )
                                            )
        vs.                              )   No. 29A05-1312-CR-637
                                            )
STATE OF INDIANA,                           )
                                            )
    Appellee-Plaintiff.                     )

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Daniel J. Pfleging, Judge
Cause No. 29D02-1306-FA-5011

**October 9, 2014**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

**STATEMENT OF THE CASE**

Stacey D. Cox appeals her convictions for involuntary manslaughter, as a Class D felony, and operating a child care home without a license, a Class B misdemeanor. She presents two issues for our review, which we consolidate and restate as whether the State presented sufficient evidence that Cox operated a child care home under Indiana Code Section 12-17.2-5-28.6.[1]

We affirm.

**FACTS AND PROCEDURAL HISTORY**

In April 2009, Cox opened Stacey Cox Child Care, an unlicensed daycare operated out of her home in Carmel. Cox advertised her daycare through a website explaining that she "provide[s] child care services Monday through Friday, from 6am through 6pm." States' Ex. 31. Her website stated that Cox could handle a "maximum of 12 children," and she charged a flat $150 per week for fulltime enrollment. Id.

On September 19, 2012, the Family and Social Services Administration ("FSSA") received a complaint against Cox that alleged she operated a child care home with more than five unrelated children, in violation of Indiana's licensure laws. Pursuant to this complaint, Vicki Allen, a Child Care Home Licensing Consultant, visited Cox's home on October 1 and found seven children, six of whom were unrelated to Cox. At that time, Allen spoke with Cox and left an FSSA "unlicensed letter," which Cox signed, that explained the meaning of, and licensing requirements for, child care homes. Tr. at 532-

---

[1] Cox's conviction for involuntary manslaughter also turns on whether she operated a child care home.

The letter explained that Allen would follow up within ten days to verify whether Cox had come into compliance with the State's licensure requirements.

Allen returned to Cox's home on October 11 and again found six unrelated children there. Allen warned Cox that she needed to become compliant or the FSSA would take further action. On October 18, Allen visited Cox's home for the third time and, once more, found six unrelated children, which prompted the FSSA to send Cox a cease-and-desist letter on October 24. However, in subsequent visits on October 24 and 29, Allen found only five children in Cox's home. Allen testified at trial that, by reducing to five or fewer children, Cox had become compliant with the law despite her failure to obtain a license. Consequently, Allen did not return to Cox's home after October 29.

In late November 2012, Donya and Roland Jordan[2] began taking C.T. and L.T. to Cox's daycare.[3] At that time, C.T. was three months old. The Jordans and Cox agreed that Cox would watch C.T. and L.T. four days a week for $130. Donya would drop C.T. off at Cox's daycare between 9:00 and 10:00 a.m., and Roland would pick the children up at 6:00 p.m. Donya regularly observed four to six children present at Cox's home when she dropped off the children.

---

[2] C.T. and L.T.'s parents were Brittany Killea and John Tilson. In November 2012, while Killea and Tilson lived with Killea's uncle in his apartment, C.T. and L.T. stayed with the Jordans, Killea's mother and stepfather.

[3] Cox is the stepdaughter of Roland Jordan's sister, and Cox's brief insinuates that this relationship matters. However, it does not; Cox is not a qualified relative of C.T. or L.T. See Ind. Code §§ 12-7-2-162.5(1) to (11). And, in any event, Cox does not make an argument supported by cogent reasoning on this point. Ind. Appellate Rule 46(A)(8)(a).

On January 24, 2013, Donya took C.T. and L.T. to Cox's daycare. Sometime around 1:00 p.m., Kirsten Phillips, Cox's daughter and assistant, placed C.T. into a broken pack-and-play for a nap. Phillips laid C.T. atop loose blankets, one of which was adult-sized. Cox checked on C.T. soon after Phillips had placed him down for a nap, and C.T. was observed sleeping on his back. However, at 3:00 p.m., Cox again checked on C.T. and found him in the broken, sunken part of the pack-and-play. He was cold, not breathing, unresponsive, and his skin was mottled. Cox called 9-1-1 and attempted CPR but could not open C.T.'s mouth. Carmel firefighters and police responded to Cox's call and found C.T. in the same condition. He was taken to St. Vincent Carmel Hospital where he was pronounced dead.

At the scene, Cox spoke with Sergeant Nancy Zellers, an officer with Carmel Police Department's Criminal Investigations Division. Cox told Zellers that she operated an unlicensed daycare out of the home and had done so for four years and relayed that "she had 4 families that were full time, 3 that were part time." Id. at 608-09. Further, Cox stated that she cared for "about 10 kids, but didn't necessarily have all 10 at the same time." Id. Including C.T. and L.T., Zellers counted nine children at Cox's home.

On June 28, 2013, the State charged Cox with seven counts: (I) neglect of a dependent resulting in death, as a Class A felony; (II) reckless homicide, a Class C felony; (III) involuntary manslaughter, as a Class D felony; (IV) deception, a Class A misdemeanor; (V and VI) operating a child care home without a license, a Class B misdemeanor; and (VII) unlicensed practice of nursing, a Class B misdemeanor. The State subsequently dismissed Count V and renumbered the charging information.

4

The court held Cox's jury trial between October 22 and October 24. At the close of the State's case, Cox moved for a directed verdict on the involuntary manslaughter charge and on the remaining count of operating a child care home without a license. She argued that the State had failed to prove that she operated a child care home, which was necessary to support both charges.[4] The trial court denied Cox's motion. At the close of trial, the jury acquitted Cox of neglect of a dependent resulting in death, reckless homicide, and unlicensed practice of nursing, but it convicted her of involuntary manslaughter, deception, and operating a child care home without a license. The trial court then sentenced Cox for an aggregate total sentence of 970 days. Cox now appeals.

## DISCUSSION AND DECISION

Cox contends that the trial court erred when it denied her motion for a directed verdict because the State did not present any evidence that she had operated a child care home, an element upon which her convictions for involuntary manslaughter and operating a child care home without a license are premised. For the same reason, she maintains that the evidence is insufficient to sustain her convictions for these charges. However, Cox presented evidence after the denial of her motion, and "one who elects to

---

[4] In relevant part, the State's charging information stated:

> Count [III]: on or about January 24, 2013[,] Stacey Denise Cox, being a child care provider, did recklessly supervise [C.T.], a child in the care of Stacey Denise Cox, and [C.T.] did die as a result of said reckless supervision[.]
>
> * * *
>
> Count [V]: on or about January 24, 2013[,] Stacey Denise Cox did knowingly operate a child care home without a license issued under I.C. 12-17.2[.]

Appellant's App. at 10.

5

present evidence after a denial of [her] motion for directed verdict made at the end of the State's case waives appellate review of the denial of that motion."[5] E.g., Snow v. State, 560 N.E.2d 69, 74 (Ind. Ct. App. 1990). Thus, we consider Cox's sufficiency claim only.

Our standard of review for sufficiency of the evidence claims is well-settled. Tobar v. State, 740 N.E.2d 109, 111 (Ind. 2000).

> In reviewing the sufficiency of the evidence, we examine only the probative evidence and reasonable inferences that support the verdict. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we consider only the evidence most favorable to the trial court ruling and affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

Pillow v. State, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations and internal quotation marks omitted).

The Indiana Code defines child care home as follows:

(a) "'Child care home,' for purposes of IC 12-17.2, means a residential structure in which at least six (6) children (not including the children for whom the provider is a parent, stepparent, guardian, custodian, or other relative or any child who is at least fourteen (14) years of age and does not require child care) at any time receive child care from a provider:

   (1) while unattended by a parent, legal guardian, or custodian;

   (2) for regular compensation; and

---

[5] Here, waiver does not mean that an appellate court will not review the appellant's claim altogether. Instead, even where the appellant raises the directed verdict argument alone, without a concomitant sufficiency argument, our appellate courts proceed nevertheless to analyze the argument as a sufficiency claim. See, e.g., Ingram v. State, 426 N.E.2d 18, 19 (Ind. 1981); Croy v. State, 953 N.E.2d 660, 662 (Ind. Ct. App. 2011). And, indeed, this makes sense. Not only do we want "to assure that a meritorious appeal not be defeated by a procedural error," Ingram, 426 N.E.2d at 19, but, "if the evidence is sufficient to sustain a conviction on appeal, the denial of a motion for a directed verdict could not be error," Simmons v. State, 999 N.E.2d 1005, 1013 (Ind. Ct. App. 2013), trans. denied.

>    (3) for more than four (4) hours but less than twenty-four (24) hours in each of ten (10) consecutive days per year, excluding intervening Saturdays, Sundays, and holidays.

Ind. Code § 12-7-2-28.6 (emphasis supplied). Further, "relatives" include a parent, grandparent, brother, sister, stepparent, stepgrandparent, stepbrother, stepsister, first cousin, uncle, or aunt. Ind. Code §§ 12-7-2-162.5(1) to (11).

First, Cox acknowledges that nine children were found at her home on January 24, which, if unrelated, is greater than the statutory minimum of six, but asserts that the State did not present any evidence regarding the identities of those children. Specifically, Cox maintains that "the State was required to establish the lack of family relationship of Cox with the children that she was supervising. . . . Further, . . . there are no inferences that could be made that establish this evidence." Appellant Br. at 16. We disagree.

Cox herself stated that "she had 4 families that were full time, 3 that were part time." Tr. at 608-09 (emphasis supplied). From these families, she cared for "about 10 kids, but didn't necessarily have all 10 at the same time." Id. Further, Allen testified that, over several home visits only months earlier, she had observed six unrelated children in Cox's home. Donya similarly observed four to six children at Cox's home from November onward when she dropped off C.T. and L.T.

Neither C.T. nor L.T. were qualified relatives of Cox under the Indiana Code, and two other unrelated parents testified that they regularly used Cox for child care services, including during the month of January. Lindsay Duke, for instance, testified that she used Cox as a fulltime child care provider, five days a week, from June 2012 until January 2013, when C.T. died. Likewise, Dallas Millem used Cox as a fulltime childcare

provider during October, November, and most of December 2012, and he used her on a part-time basis during January 2013. Therefore, it was reasonable for the jury to infer that the seven other children found in Cox's home—in addition to the unrelated C.T. and L.T.—were also unrelated to Cox.

Second, Cox contends that the State did not establish that Cox provided care to six unrelated children for regular compensation but, instead, established "only four children that were being cared for in Cox's home for 'regular compensation' . . . ." Appellant's Br. at 16. As Cox acknowledges, the State did demonstrate through trial testimony that Cox cared for four children for regular compensation. The Jordans paid Cox regular compensation, $130 weekly, for the care of C.T. and L.T. Duke paid the full $150 weekly charge for fulltime care, as did Millem, until his child went part-time, at which point he paid Cox $90 weekly. And Cox's own website expresses that she provided her unlicensed services for a regular fee. The relevant portion follows:

Cost

$150 per week. Full-time enrollment <u>only</u>.

Late Fees

A $25 late fee is incurred if the child is not picked up by 6:15p.m. Each additional 15 minutes late is another $10. We feel that our hours of 6am-6pm are very generous, and must unfortunately implement this fee structure.

State's Ex. 31 (emphasis in original).

Therefore, Cox's claim is not persuasive. As discussed, the State established that a total of nine children were found in Cox's home on January 24, and, on the evidence presented, a jury could infer that all nine were not related to Cox. Moreover, in addition

8

to the testimony regarding compensation for the care of C.T., L.T., Duke's child, and Milem's child, Cox's website declared that she charged regular fees for her child care services. Again, "[t]he evidence is sufficient if an inference may reasonably be drawn from it to support the verdict," Drane v. State, 867 N.E.2d 144, 147 (Ind. 2007), and a reasonable jury could infer from the evidence that Cox received regular compensation to care for at least six unrelated children in her home. We affirm her convictions.

Affirmed.

BAILEY, J., and PYLE, J., concur.