

FILED

Jan 23 2024, 8:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Jesse R. Drum
Assistant Section Chief
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Mark A. Bates
R. Brian Woodward
Office of Lake County Public
Defender
Crown Point, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

State of Indiana,

*Appellant-Defendant/Cross-Appellee,*

v.

Trisha M. Woodworth,

*Appellee-Plaintiff/Cross-Appellant.*

January 23, 2024

Court of Appeals Case No.
22A-CR-2557

Appeal from the Lake Court

The Honorable Samuel L. Cappas,
Judge

Trial Court Cause No.
45G02-1703-F1-5

**Opinion by Judge Pyle**

Judges Vaidik and Mathias concur.

**Pyle, Judge.**

## Statement of the Case

[1] The State of Indiana ("the State") appeals the trial court's order, which granted the trial court's own motion to correct error, vacated Trisha Woodworth's ("Woodworth") conviction by jury for Level 1 felony neglect of a dependent resulting in death, and granted Woodworth a new trial. The State argues that the trial court abused its discretion when it granted its own motion to correct error. On cross-appeal, Woodworth argues that there is insufficient evidence to support her conviction for Level 1 felony neglect of a dependent resulting in death.

[2] Concluding that the trial court abused its discretion when it granted its own motion to correct error, we reverse the trial court's judgment and reinstate Woodworth's conviction for Level 1 felony neglect of a dependent resulting in death. Further, addressing Woodworth's cross-appeal and concluding that there is insufficient evidence to support her conviction, we reverse Woodworth's conviction for Level 1 felony neglect of a dependent resulting in death.

[3] We reverse.

## Issues

>   Appeal Issue: Whether the trial court abused its discretion when
>   it granted its own motion to correct error.

Cross-Appeal Issue: Whether there is sufficient evidence to support Woodworth's conviction for Level 1 felony neglect of a dependent resulting in death.

## Facts

M.M. ("M.M.") was born in July 2015 to Ryan Moore ("Father") and Megan Garner ("Mother") (collectively "Parents"). Mother's stepmother ("maternal step-grandmother") initially cared for M.M. while Parents worked. However, when maternal step-grandmother went back to work in January 2016 and was no longer able to care for M.M., Mother asked Woodworth if she could take care of M.M. four days a week while Parents worked. Mother and Woodworth had been "really good friends" since middle school, and Mother had lived with Woodworth's family for a short time while Mother and Woodworth were in high school. (Tr. Vol. 4 at 69). Woodworth, who was a stay-at-home mom with two children, including a one-year-old son ("Woodworth's son") and a six-year-old daughter, agreed to care for M.M. on Mondays, Tuesdays, Wednesdays, and Fridays. Another friend of Mother's, Kerri Hart ("Hart"), had already agreed to take care of M.M. on Thursdays.

On the evening of Monday, April 11, 2016, Mother was sitting on the floor playing with eight-month-old M.M. when M.M. fell over Mother's leg and hit her head on the hardwood floor. M.M. had a "little red scuff" on her forehead above her eyebrow and cried for about thirty seconds. (Tr. Vol. 3 at 36). Parents did not notice any changes in her behavior that evening and did not seek medical assistance.

[6] During the course of that week, Mother noticed that M.M. was fussier and whinier than usual and wanted Mother to hold her. When Mother dropped M.M. off at Hart's home on Thursday, April 14, Mother asked Hart to give M.M. ibuprofen because she "seemed fussy[,]" and Mother believed that M.M. was teething. (Tr. Vol. 4 at 16). Hart noticed that M.M. had a bruise on her forehead. M.M. usually took a nap at 11:00 a.m.; however, that day, Hart noticed that M.M. seemed tired at 9:15 a.m. When M.M. woke up from her nap, she was "fussy and whiny." (Tr. Vol. 4 at 22). Later that day, Hart took M.M. outside for a walk. Hart and M.M. walked past a neighbor's house, and the neighbor noticed a "little goose bump on [M.M.]'s head with a bruise." (Tr. Vol. 4 at 57). Hart and M.M. returned to Hart's house, and M.M. played outside at a water table for about three hours and seemed fine.

[7] Mother dropped M.M. off at Woodworth's home on Friday, April 15, at 8:00 a.m. Woodworth's significant other and the father of her children, Enrique Meraz ("Meraz") left the house for work at approximately 9:15 a.m. As he walked out the front door, Meraz noticed that M.M. was playing with toys while lying on a blanket in the living room.

[8] Woodworth had invited her sister, Tasha Woodworth ("Tasha"), mother, Lori Woodworth ("Lori"), and grandmother, Patricia Thomas ("Patricia") to her house to have lunch that afternoon. Tasha and Lori arrived at Woodworth's home at 11:30 a.m., and Patricia arrived at noon. The women sat in the living room and visited while Woodworth's son and M.M. were napping. Woodworth's son woke up at approximately 1:00 p.m.

[9] About five minutes later, the women heard M.M. crying in the bedroom where she had been napping. Woodworth and Tasha went into the bedroom to check on her. M.M. seemed "crabby[,]" "fussy[,]" and "a little whiny[,]" but she grabbed Tasha's finger and appeared alert. (Tr. Vol. 5 at 44). Woodworth changed M.M.'s diaper and handed M.M. to Tasha. Tasha took M.M. into the living room and played with her while Woodworth went to the kitchen to make her bottle. Lori noticed that M.M. had a bruise with "an egg-sized knot" on her forehead. (Tr. Vol. 5 at 66). When Woodworth came into the living room with M.M.'s bottle, Tasha handed M.M. to Woodworth. Woodworth attempted to feed M.M.; however, M.M.'s eyes closed, she "kind of slumped over[,]" and she would not take the bottle. (Tr. Vol. 5 at 24). Lori thought that M.M. was "still a little sleepy from her nap." (Tr. Vol. 5 at 46). But, when Woodworth tried to feed M.M. again, M.M. "didn't look right[.] [H]er eyes weren't open and her breathing looked funny." (Tr. Vol. 5 at 46).

[10] At 1:15 p.m., Woodworth texted Mother and asked Mother to telephone her. While Woodworth was attempting to contact Mother, Tasha and Lori put a cold rag on M.M.'s head to help her wake up. However, the cold rag had no effect. Tasha and Lori then took M.M. outside to get some fresh air, but that had no effect on M.M. either. When Mother telephoned Woodworth, Woodworth told her that she had tried to give M.M. a bottle and that "she wasn't waking up." (Tr. Vol. 4 at 91). Mother told Woodworth to call 911. Woodworth called 911 at 1:24 p.m.

[11] Paramedic Richard Traybsza, Jr., ("Paramedic Traybsza") and EMT Micheal Chiaro ("EMT Chiaro") were dispatched to Woodworth's home for an unresponsive eight-month-old child. When Paramedic Traybsza and EMT Chiaro arrived at the scene, Tasha handed M.M. to Paramedic Traybsza. As Paramedic Traybsza was walking towards the ambulance with M.M., M.M.'s "caretaker" told him "[t]hat this ha[d] been going on all day." (Tr. Vol. 5 at 75). Paramedic Traybsza noticed that M.M. had a bump on her forehead and was "belly breathing[,]" which is abnormal breathing without full lung expansion. (Tr. Vol. 5 at 78). In addition, Paramedic Traybsza noticed that M.M. was unresponsive, her eyes were not moving, and she had no reaction to light or pain stimulus.

[12] While Paramedic Traybsza was examining M.M., Tasha told EMT Chiaro that "this [had] just happened." (Tr. Vol. 5 at 105). Tasha further told EMT Chiaro that M.M. had been "fine for awhile after she [had gotten] up and then . . . she wasn't waking up and she wasn't responding to anything." (Tr. Vol. 5 at 28). When EMT Chiaro asked about the bump on M.M.'s head, Tasha told him that Mother had said that the bump had happened a few days ago. EMT Chiaro responded that "[i]f it were my child, I would have taken them in to get seen." (Tr. Vol. 5 at 116).

[13] Lake County Sheriff's Department Officer Lawrence Obregon ("Officer Obregon") was the first officer to arrive at the scene. He had heard the radio dispatch and had responded to the scene because he had been in the vicinity. As he walked by the ambulance, Officer Obregon noticed the medical

professionals rendering aid to M.M. Officer Obregon walked to Woodworth's residence and asked Woodworth what had happened. Woodworth responded that she was M.M.'s babysitter and that she had noticed at some point that M.M. had become unresponsive. Woodworth further told Officer Obregon that when she had realized that "something was not right," she had "immediately" called 911. (Tr. Vol. 4 at 179).

[14] When Mother arrived at the scene shortly after 1:30 p.m., she noticed two ambulances and five Lake County Sheriff's Department vehicles. Mother ran to the ambulance, opened the doors, and explained that she was M.M.'s mother. However, the deputies refused to allow Mother to enter the ambulance and told her to wait in the yard. While Mother was waiting in the yard, the deputies "yelled at" her, mentioned the bruise on M.M.'s head, and asked Mother why she had not taken M.M. to the hospital. (Tr. Vol. 4 at 123). Mother "felt like a suspect." (Tr. Vol. 4 at 124). Shortly thereafter, the ambulance transported M.M. to Methodist Hospital in Gary.

[15] After the ambulance had left, Lake County Sheriff's Department Detective Jeremy Kalvaitis ("Detective Kalvaitis") spoke with Woodworth. Woodworth told Detective Kalvaitis that M.M. had arrived at her home at approximately 8:00 a.m. that morning. According to Woodworth, at that time, M.M. had been happy and alert. Woodworth had played with M.M. that morning, and after she had given M.M. a bottle, Woodworth had put M.M. down for her morning nap at 10:00 a.m. Woodworth further told Detective Kalvaitis that "a couple of hours later, which [Detective Kalvaitis had] denoted . . . in [his] notes

as noon[,]" M.M. had woken up.  (Tr. Vol. 5 at 200).  In addition, Woodworth told Detective Kalvaitis that M.M. had been lethargic.  According to Woodworth, M.M.'s "breathing had become funny, and she just didn't seem like herself[.]  [I]t seemed as if she were gasping for air."  (Tr. Vol. 5 at 201).  Woodworth further told Detective Kalvaitis that Tasha and Lori had tried to revive M.M. by using a cold compress and by taking her outside.  When that did not work, Woodworth had contacted Mother, who had told Woodworth to call 911.  Woodworth showed Detective Kalvaitis her cell phone, which showed that she had called 911 at 1:24 p.m.

[16]  In the meantime, when Mother arrived at Methodist Hospital in Gary, hospital staff members were preparing M.M. for a helicopter transfer to the University of Chicago Comer Children's Hospital ("Comer Children's Hospital").  Mother, Father, and other family members drove to Chicago.  Mother thought that M.M.'s condition was a result of the fall on her head at home on Monday evening.  However, when Parents arrived at Comer Children's Hospital, Dr. Jill Glick ("Dr. Glick"), medical director of the child advocacy and protective services team at Comer Children's Hospital, told Parents that "a violent shaking episode [had taken] place at [Woodworth]'s home."  (Tr. Vol. 4 at 140).  M.M. died two days later at Comer Children's Hospital.  Following an autopsy, the medical examiner concluded that M.M.'s cause of death was "blunt force head injuries with . . . cervical injuries as a contributing factor."  (Tr. Vol. 6 at 57).  The medical examiner further concluded that the manner of M.M.'s death was homicide.

[17]     In March 2017, the State charged Woodworth with:  (1) Count 1 - Level 1 felony aggravated battery; (2) Count 2 – Level 1 felony neglect of a dependent resulting in death; and (3) Count 3 – Level 2 felony battery resulting in death to a person less than fourteen years of age.  Specifically, Count 1 alleged that Woodworth "did knowingly or intentionally inflict injury on a person that created a substantial risk of death to [M.M.] . . . and did result in the death of [M.M.][.]" (App. Vol. 2 at 39).  Count 2 alleged that Woodworth "did knowingly place [M.M.] in a situation that endangered [M.M.]'s life or health, to-wit:  not providing immediate medical attention upon injury and resulted in the death of [M.M.][.]"  (App. Vol. 2 at 39).  In addition, Count 3 alleged that Woodworth, "did knowingly or intentionally touch [M.M.] . . . in a rude, insolent, or angry manner, to-wit: shaking [M.M.] resulting in the death of [M.M.][.]"  (App. Vol. 2 at 39).

[18]     At Woodworth's six-day trial in July 2022, the jury heard testimony regarding the facts as set forth above.  In addition, Dr. Glick, the State's first expert witness, testified that when M.M. had arrived at Comer Children's Hospital, M.M. had presented with both a "subdural hematoma . . . pretty much over the right side of her head[]" and "significant retinal hemorrhaging in both eyes." (Tr. Vol. 3 at 136, 139).  According to Dr. Glick, M.M.'s injuries were consistent with "[a]busive head trauma and the mechanism [was] cranial rotation or shaking."  (Tr. Vol. 3 at 146).  In addition, Dr. Glick testified that when a child has this type of brain trauma, the child is "immediately

symptomatic[]" and that "[t]here's really no delay." (Tr. Vol. 3 at 154). Dr. Glick further testified as follows:

> [I]n the adult world, we know that with cranial rotational injury it's the same thing. And so you're immediately symptomatic, and that's just a normal dictum in head trauma. In fact, I was part of helping develop the Regional Response to Head Trauma in Illinois, and the goal is to get the person in within an hour to treat, because then you can even reverse the disease, the damage. That implies they're immediately symptomatic. So the bottom line is this child was immediately symptomatic after this shaking event occurred or shaking events occurred.

(Tr. Vol. 3 at 154-55). Dr. Glick further testified that she had not been concerned that M.M. had fallen and hit her head the Monday before her death because she had not shown any symptoms of a brain injury for four days.

[19]   During cross-examination, Dr. Glick acknowledged that given the number of people in Woodworth's home at the time of M.M.'s alleged injury, it could have been anyone who had shaken M.M. Dr. Glick further acknowledged that M.M. had no external injuries consistent with having been shaken and that irritability and fussiness are possible symptoms of a brain injury.

[20]   The State's second expert witness was Dr. Ponni Arunkumar ("Dr. Arunkumar"), the chief medical examiner at the Cook County medical examiner's office in Chicago. Although Dr. Arunkumar did not perform M.M.'s autopsy, Dr. Arunkumar had reviewed M.M.'s medical records and had drawn her own conclusions. According to Dr. Arunkumar, M.M.'s cause of death was "blunt force head injuries[,]" and the manner of death was

homicide. (Tr. Vol. 6 at 57). Dr. Arunkumar testified that M.M. would have become "unconscious when the injuries [had been] inflicted." (Tr. Vol. 6 at 59). Dr. Arunkumar further opined that M.M.'s injuries could not have resulted from her fall on the Monday night before her death.

[21] At the end of the State's case-in-chief, Woodworth made an oral motion for a directed verdict on all three counts. The trial court denied Woodworth's motion, and the trial continued.

[22] During Woodworth's case, she presented the testimony of three expert witnesses. Dr. John Galaznik ("Dr. Galaznik") was the first expert witness. Dr. Galaznik "closely follow[s] and ha[s] published in the area of the biomechanical research relevant to shaking and short distance falls." (Vol. 6 at 113). Dr. Galaznik testified that he disagreed with Dr. Glick's opinion that M.M.'s injuries had resulted from a shaking. Dr. Galaznik specifically explained as follows:

> [B]ecause [M.M.] weighed greater than 16 pounds, and the biomechanical studies from a retinal hemorrhaging point of view, from a brain injuring point of view and from a subdural hemorrhage point of view have failed to confirm with experimental research that the levels that you could generate in such a maneuver would actually be predicted to be injuring.

(Tr. Vol. 6 at 118). According to Dr. Galaznik, M.M.'s fall on the Monday before she died was significant because M.M. "was about 28-inches tall. So you're talking about a 28-inch head drop to a hard surface." (Tr. Vol. 6 at 150-51). Dr. Galaznik opined that M.M.'s fall could have contributed to her death.

[23]     Dr. Joseph Scheller ("Dr. Scheller"), a pediatric neurologist who specializes in neuroimaging, was Woodworth's second expert witness. Dr. Scheller testified that he had reviewed M.M.'s medical records, including the results of a scan that had been done at Comer Children's Hospital. According to Dr. Scheller, M.M.'s fall on the Monday evening before her death

> affected a large vein that was responsible for draining the blood out of a good portion of her brain. That head injury triggered a blood clot. That blood clot grew over time. And it grew big enough that [it] seriously disrupted blood flow out of her brain. Not into her brain, but out of her brain. And it caused the brain to swell and it caused her to collapse and become deathly ill. The other things that the attorney mentioned, the small subdural hematoma and the retinal hemorrhages, are incidental. They go along with it, but those didn't kill her, and those are not responsible for what turned out. They are just incidental findings. And so it's an unfortunate thing, and we would never want it to happen to anybody, but she had bad luck and died from complications of a relatively minor head injury.

(Tr. Vol. 7 at 51). Dr. Scheller further explained that as the clot in M.M.'s brain was growing, M.M. would have shown symptoms such as increased irritability. In addition, Dr. Scheller explained that on April 15, the blockage caused by the blood clot became so dramatic that M.M.'s brain began to swell. Dr. Scheller further explained that once the clot had blocked the blood flow, the symptoms would have been immediate. According to Dr. Scheller, the labored breathing that M.M. experienced after waking up from her nap at Woodworth's home was "consistent with the moment where the backup just got too dramatic and the stroke got too large." (Tr. Vol. 7 at 55). Dr. Scheller also testified that "[a]s a neurologist who has seen a lot of kids with strokes and adults with strokes,

[he] would disagree" with Dr. Glick's opinion, which was "spoken by a non-neurologist." (Tr. Vol. 7 at 59).

[24] Forensic pathologist, Dr. George Nichols ("Dr. Nichols"), was Woodworth's third expert witness. Dr. Nichols also disagreed with Dr. Glick's opinion that M.M. had been shaken. Specifically, Dr. Nichols testified that M.M.'s fall on the Monday before her death "was of sufficient force in the right place to set in motion a series of events that eventually led to her death." (Tr. Vol. 7 at 137). Dr. Nichols further testified that M.M. had a borderline abnormally large head, which may have rendered her "more prone to develop intracranial hemorrhage." (Tr. Vol. 7 at 116). In addition, Dr. Nichols pointed out that M.M. did not have ligament, muscle, or tissue damage that "you find with shaking." (Tr. Vol. 7 at 207).

[25] Following the presentation of evidence in her case, Woodworth orally renewed her motion for a directed verdict, and the trial court denied it. In addition, the trial court asked one of Woodworth's counsels ("Woodworth's counsel") if he was going to tender final instructions on any lesser-included offenses, and Woodworth's counsel responded that he was not.

[26] During closing argument, Woodworth's counsel argued that the State had failed to prove beyond a reasonable doubt that M.M. had been shaken or that Woodworth had shaken her. In addition, Woodworth's counsel specifically addressed "the State's argument [based on Detective Kalvaitis' testimony] that somehow [Woodworth had gone] into the bedroom at noon and [had] woke[n]

[M.M.] up." (Tr. Vol. 7 at 218-19). Woodworth's counsel specifically argued as follows:

> If [M.M.] woke up at noon, that would mean . . . that they didn't call 911 for an hour and 15 minutes. So [M.M.] wakes up and [she] is not alert and healthy and functioning. Do you think that these four people - - it's not only [Woodworth] at that point, it's all four of them - - are going to let [M.M.] languish and call 911 an hour and 20 minutes later? The evidence is that [M.M.] woke up at 1:00 [p.m.]. [M.M.] was healthy. [M.M.] was alert. And suddenly [M.M.] stroked, and that's when [M.M.] went downhill.

(Tr. Vol. 7 at 219-20).

[27] The jury convicted Woodworth of Level 1 felony neglect of a dependent resulting in death and acquitted her of Level 1 felony aggravated battery and Level 2 felony battery resulting in death to a person less than 14 years of age. In August 2022, Woodworth filed a motion to correct error wherein she argued that there was insufficient evidence to support her conviction for Level 1 felony neglect of a dependent resulting in death. She asked the trial court to either direct a verdict in her favor or to grant her a new trial. Woodworth also asked the trial court to grant her a new trial based on a juror's letter that had expressed doubt about Woodworth's guilt. The State filed a response asking the trial court to deny Woodworth's motion to correct error.

[28] The trial court held a motion to correct error hearing in September 2022. After the parties had made their respective arguments, the trial court stated that "[t]he attorneys, obviously, worked hard on both sides. They did a great job

developing their respective cases, their theories. The work that went into it is extensive, and that's obvious." (Tr. Vol. 8 at 49-50). The trial court specifically told Woodworth's counsel that he "clearly [was] a skilled trial attorney." (Tr. Vol. 8 at 50). The trial court further told Woodworth's counsel as follows: "Your examination of the experts, defense experts and State's was masterful. There's no doubt you prepared upon this case." (Tr. Vol. 8 at 50-51). The trial court then asked Woodworth's counsel, "what number criminal trial is this of yours?" (Tr. Vol. 8 at 51). When Woodworth's counsel responded that it was his first felony trial, the trial court told Woodworth's counsel that "[i]t wasn't obvious[.]" (Tr. Vol. 8 at 51).

[29] Thereafter, the trial court reviewed the State's theory of the case that Woodworth had inflicted an injury on M.M., Woodworth's theory of the case that M.M. had fallen on a Monday and had had a stroke on a Friday, and the jury's verdicts that Woodworth had not inflicted an injury on M.M. The trial court then explained that the issue was whether Woodworth had "place[d] [M.M.] in a situation that [had] endangered [M.M.]'s life or health by not providing immediate medical attention." (Tr. Vol. 8 at 52). The trial court further explained as follows:

> [T]he evidence as presented by [Woodworth's counsel] . . . was that from the time [M.M.] became unresponsive to the time that a phone call was placed to 911, was approximately - - I am just going to say nine minutes. But in between, members of [Woodworth]'s family were trying to render aid to [M.M.] They were - - a damp cloth. Take [M.M.] outside for fresh air. They were doing what I think would be in the normal realm of a

layperson trying to render aid. From my perspective, it would not be immediately apparent that 911 should have been called. [M.M.] is not responsive, let's call 911. Well, first let's try a cold cloth, outside. I think those are reasonable actions to take. Now if that had been a couple of hours and they didn't call, clearly that's a different story.

\* \* \* \* \*

So I am left with sentencing a woman to between 20 to 40 years in prison for arguably, at the farthest stretch, a nine-minute delay in calling the ambulance. Let's say that it took five or six minutes to provide compresses and take her outside and then there's three or four minutes left, so they took some reasonable steps, took five or six minutes. And then they determined to call the ambulance after those efforts of - - it wouldn't be quite resuscitation, but trying to wake her up. So three or four minutes, she is going to prison for a minimum of 20 years? I don't know.

(Tr. Vol. 8 at 52, 53).

[30] The trial court apologized to Woodworth's counsel for what it was "about to say." (Tr. Vol. 8 at 53). According to the trial court, it had "coincidentally" and "serendipitously" read a case that morning regarding the topic of ineffective assistance of counsel. (Tr. Vol. 8 at 54). The trial court told Woodworth's counsel that it was not saying that he was unprofessional but that there were some things that had troubled the trial court regarding the procedure of the case. The trial court first asked if the State had offered a plea to Woodworth. The State told the trial court that Woodworth's counsel "had made a proposal at the far low end of the felony scale. And I believe with a request for a misdemeanor as well. Based on that, I didn't think we could ever bridge the

gap." (Tr. Vol. 8 at 54-55). The trial court responded that it "underst[oo]d that completely." (Tr. Vol. 8 at 55).

[31] The trial court then pointed out that Woodworth's counsel had not requested jury instructions on lesser-included offenses. In addition, the trial court stated that it did not believe that Woodworth's counsel had included the Level 1 felony of neglect of a dependent resulting in death count in closing arguments. The trial court acknowledged that ineffective assistance of counsel claims are typically "raised on a PCR[]" but further explained as follows:

> So there's a case State v. Johnson[,] 714 N.E.2d 1209 [(Ind. Ct. App. 1999)] that basically says that the trial court under Rule 59(b) can grant it[]s own motion to correct error. Basically, what I have just stated that it is [Woodworth's counsel]'s first [felony] trial. I don't think he argued anything on the Count II [Level 1 felony neglect of a dependent resulting in death] during his closing, coupled with the fact that it's - - it would be, from my perspective, a manifest injustice to sentence Trisha Woodworth to prison for 20 years for a nine-minute delay of the phone call.
>
> I am setting aside the verdict in this case and vacating the sentencing [hearing scheduled for] tomorrow. I am recusing myself and setting this case out of this court. That is what is happening.
>
>       *    *    *    *    *
>
> And I may very well be wrong with everything I said, it's - - I don't know. But I - - under these circumstances, I cannot - - I can't do it.

(Tr. Vol. 8 at 55-56).

[32]    When the State asked the trial court under which of the Woodworth's theories it was granting relief, the trial court responded and explained as follows:

> None by the defense[.]  That is my conglomeration of it being a manifest injustice without - - [Woodworth's counsel] didn't argue Count II in his closing argument.  It's his first jury trial.  He's a skilled trial attorney.  He's new to the criminal thing - - the criminal realm.  He didn't try to minimize his client's exposure to prison time by way of a plea agreement.  Plus coupled with the fact that in my own opinion that nine minutes is not an unreasonable delay to have called the ambulance.
>
> *     *     *     *     *
>
> That's what I am finding.  Nine minutes does not justify 20 years, regardless of what the jury found.  Even if they found - - so I am not saying I am going against the jury and reweighing the evidence.

(Tr. Vol. 8 at 57, 59).

[33]    The trial court further stated that it was vacating Woodworth's conviction for Level 1 felony neglect of a dependent resulting in death and ordering a new trial.  In addition, the trial court released Woodworth on her own recognizance despite the State's request that Woodworth post an additional bond.

[34]    In its written order issued that same day, the trial court agreed with Woodworth's "excellent argument . . . with regard to the time line of the onset of symptoms to the 911 call.  This time frame was approximately nine (9) minutes[.]  The Court finds that nine (9) minutes was a reasonable amount of time to determine whether or not 911 needed to be called."  (App. Vol. 2 at 7). The trial court's order further provides as follows:

The Court acknowledges that [Woodworth's counsel] is a skilled civil trial attorney however, the Court finds that due to [Woodworth's counsel]'s inexperience, he failed to negotiate any type of plea agreement to present to his client in an attempt to minimize punishment. Also, at the end of the trial, he neglected to consider lesser-included offenses and discuss them with his client. Had [Woodworth] requested instructions on lesser-included offenses, under the facts and circumstances of this case, the Court would have seriously considered I.C. 35-46-1-4(a)(1) as a potential relevant lesser-included offense. Moreover, in closing arguments, [Woodworth's counsel] failed to make any arguments with regard to Count II, Neglect of a Dependent Resulting in Death, for which his client was convicted. The Court finds that counsel's lack of criminal experience, and therefore performance, fell below an objective standard of reasonableness, which the Court attributes to this being the first criminal trial of defense counsel.

(App. Vol. 2 at 7-8).

[35] The State now appeals, and Woodworth cross-appeals.

## Decision

[36] The State argues that the trial court abused its discretion when it granted its own motion to correct error. On cross-appeal, Woodworth argues that there is insufficient evidence to support her conviction of Level 1 felony neglect of a dependent resulting in death. We address each of the parties' contentions in turn.

### 1. Motion to Correct Error

[37]     The State argues that the trial court abused its discretion when it granted its own motion to correct error and granted Woodworth a new trial. We agree.

[38]     We review the trial court's decision to grant a new trial for an abuse of discretion. *Weida v. Kegarise*, 849 N.E.2d 1147, 1154 (Ind. 2006). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court or if the trial court has misinterpreted the law. *Abbott v. State*, 183 N.E.3d 1074, 1083 (Ind. 2022).

[39]     Here, the trial court granted Woodworth a new trial for two reasons. Specifically, the trial court found that: (1) Woodworth's counsel was ineffective; and (2) the jury's verdict did not accord with the evidence because nine minutes was a reasonable amount of time for Woodworth to determine whether she should call 911. Neither reason supports the trial court's grant of its own motion to correct error.

[40]     Regarding the trial court's findings that Woodworth's counsel was ineffective, we note that the trial court found that Woodworth's counsel was ineffective because he failed to: (1) negotiate a plea agreement; (2) tender lesser-included offense instructions; and (3) argue the Level 1 felony neglect of a dependent count in his closing argument.

[41]     At the outset, we note that the trial court cited *State v. Johnson*, 714 N.E.2d at 1209, as authority to grant Woodworth a new trial based upon the ineffectiveness of her counsel. However, the facts in *Johnson* are distinguishable from the facts in this case. In the *Johnson* case, after Johnson had been

convicted, his counsel filed a motion for a mistrial based entirely on his own ineffective representation. Johnson's counsel specifically claimed that "due to his responsibilities in other cases, a lack of time for preparation, and fatigue, he was not adequately prepared for trial and made 'grievous and prejudicial errors that . . . rose to the level of ineffective counsel.'" *Id*. at 1210. The trial court denied Johnson's counsel's mistrial motion. "However, citing its responsibility to prevent manifest injustice, the trial court set aside the jury's verdict[]" and ordered a new trial. *Id*. The State appealed. We concluded that the "record before us present[ed] ample evidence of trial counsel's deficient performance[]" and affirmed the trial court's judgment. *Id*. at 1212.

[42] Here, however, Woodworth's counsel did not ask for a new trial based on his own ineffective representation. Rather, despite showering Woodworth's counsel with glowing compliments regarding his excellent advocacy, the trial court sua sponte found that Woodworth's counsel was ineffective. *Johnson* does not support the trial court's action in this case.

[43] We further note that *Strickland v. Washington*, 466 U.S. 668 (1984) established the two-part test of deficient performance and prejudice for adjudicating challenges to the effectiveness of trial representation. The deficient performance prong ultimately presents a single overarching issue of whether counsel's performance, as a whole, fell below "an objective standard of reasonableness" based on "prevailing professional norms." *Id*. at 685. "Isolated poor strategy, bad tactics, a mistake, carelessness or inexperience do not necessarily amount to ineffective assistance of counsel unless, taken as

whole, the defense was inadequate." *Davis v. State*, 675 N.E.2d 1097, 1100 (Ind. 1996) (cleaned up). For example, our Indiana Supreme Court has previously held that a strategical decision not to tender a lesser-included offense instruction does not constitute ineffective assistance of counsel, even where the lesser included offense is inherently included in the greater offense. *Autrey v. State*, 700 N.E.2d 1140, 1141 (Ind. 1998). In addition, counsel's performance is presumed to be effective. *Id.* Further, "Indiana courts have required strong and convincing evidence to overcome the presumption of effective defense counsel." *Davis*, 675 N.E.2d at 1100.

[44] As the trial court noted, an ineffective assistance of counsel claim is typically raised in a post-conviction relief proceeding, where the post-conviction court may receive new evidence to develop facts beyond those contained in the record. *See Jewell v. State*, 887 N.E.2d 939, 941-42 (Ind 2008). For example, a trial counsel has the opportunity to testify as to his or her trial strategy. Here, the trial court essentially converted the motion to correct error hearing into a post-conviction hearing but did not offer Woodworth's counsel the opportunity to testify regarding his trial strategy. As a result, the trial court ignored the presumption that counsel's performance was effective. In addition, the trial court failed to ask Woodworth if she wanted to assert such a claim and use her one post-conviction opportunity. We caution trial courts against sua sponte making an ineffective assistance of counsel determination and conclude that the trial court abused its discretion when it granted its own motion to correct error based on a finding that Woodworth's counsel was ineffective.

[45] Regarding the trial court's finding that the jury's verdict did not accord with the evidence, we note that although Trial Rule 59(B) authorizes a trial court to make its own motion to correct error, "[s]etting aside a jury's verdict and granting a new trial is not to be done lightly[.]" *Walker v. Pullen*, 943 N.E.2d 349, 352 (Ind. 2011). "In all cases where relief is granted, the [trial] court is required to 'specify the general reasons' for granting relief." *Id*. Trial Rule 59(J)(7) further requires as follows:

> When a new trial is granted because the verdict, findings or judgment do not accord with the evidence, the court shall make special findings of fact upon each material issue or element of the claim or defense upon which a new trial is granted. Such finding shall indicate whether the decision is against the weight of the evidence or whether it is clearly erroneous as contrary to or not supported by the evidence; if the decision is found to be against the weight of the evidence, the findings shall relate the supporting and opposing evidence to each issue upon which a new trial is granted; if the decision is found to be clearly erroneous as contrary to or not supported by the evidence, the findings shall show why judgment was not entered upon the evidence.

[46] Our Indiana Supreme Court has "long held that strict compliance with the substantive and procedural requirements of Trial Rule 59(J) is of 'paramount' importance." *Walker*, 943 N.E.2d at 352. Our supreme court has further explained that "[s]pecific findings are necessary to temper the use of the 'extraordinary and extreme' power to overturn the jury's verdict by assuring that the decision is based on a complete analysis of the law and facts." *Id*. In *Weida*, our Indiana Supreme Court also explained that the most important reason for Rule 59(J)'s "arduous and time-consuming requirements" is "to

assure the public that the justice system is safe not only from capricious or malicious juries, but also from usurpation by unrestrained judges." *Weida*, 849 N.E.2d at 1153 (cleaned up). "In other words, when a court overrides the jury in its special domain and substitutes its own verdict for theirs without a clear showing that the ends of justice required it, it is likely that they did not." *Walker*, 943 N.E.2d at 352 (cleaned up). When a court grants a new trial without making the specific findings, the remedy on appeal is to reinstate the jury verdict. *Weida*, 849 N.E.2d at 1147.

[47] Here, our review of the trial court's order reveals that the trial court granted Woodworth a new trial because it believed that the jury's verdict was not in accord with the evidence. However, the trial court did not state whether the jury's verdict was against the weight of the evidence or clearly erroneous. Rather, the trial court made only general findings and not the special findings required by Trial Rule 59(J). We, therefore, reinstate Woodworth's conviction for Level 1 felony neglect of a dependent resulting in death.[1]

## 2. Sufficiency of the Evidence

[48] On cross-appeal, Woodworth argues that there is insufficient evidence to support her conviction of Level 1 felony neglect of a dependent resulting in

---

[1] Woodworth acknowledges that the trial court failed to make the specific findings required by Trial Rule 59(J)(7). However, she argues that "[s]trict adherence to the rule's requirement of special findings relating the supporting and opposing evidence upon which a new trial is granted should not be applied so forcefully in criminal trials where the burden of proof is higher than in civil trials." (Woodworth's Br. 14). Woodworth's argument is essentially a request that we change the law. We decline this request.

death.  Because we have reinstated her conviction, we address this issue and agree that there is insufficient evidence to support her conviction. [2]

[49]   Our standard of review for sufficiency of the evidence claims is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict.  *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007).  We do not reweigh the evidence or judge witness credibility.  *Id.*  We will affirm the conviction unless no reasonable fact finder could find the elements of the crime proven beyond a reasonable doubt.  *Id.*  The evidence is sufficient if an inference may be reasonably drawn from it to support the verdict.  *Id.* at 147.

[50]   In addition, in *Patel v. State*, 60 N.E.3d 1041, 1049 (Ind. Ct. App. 2016), we explained as follows:

> Although this standard of review is deferential, it is not impossible, nor can it be.  Article 7, Section 6 of the Indiana Constitution guarantees "in all cases an absolute right to one appeal."  An impossible standard of review under which appellate courts merely "rubber stamp" the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory.  While we seldom reverse for insufficient evidence, in every case where that issue is raised on appeal we have an affirmative duty to make certain that the proof at trial

---

[2] Woodworth also argues on cross-appeal that the trial court erred in denying her directed verdict motion, which she made at the end of the State's case.  However, because Woodworth presented evidence after the trial court denied her motion, she has waived appellate review of this issue.  *See Cox v. State*, 19 N.E.3d 287, 281 (Ind. Ct. App. 2014) (explaining that a defendant who presents evidence after a denial of her motion for a directed verdict made at the end of the State's case waives appellate review of the denial of that motion).  Thus, we consider only Woodworth's sufficiency claim.  *See id.*

was, in fact, sufficient to support the judgment beyond a reasonable doubt. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. A reasonable inference of guilt must be more than a mere suspicion, conjecture, conclusion, guess, opportunity, or scintilla.

[51] At the time that the State charged Woodworth in 2016, INDIANA CODE § 35-46-1-4 provided, in relevant part, as follows:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
>
> > (1) places the dependent in a situation that endangers the dependent's life or health;
> >
> > \*     \*     \*     \*     \*
> >
> > commits neglect of a dependent, a Level 6 felony.
>
> (b) However, the offense is:
>
> > \*     \*     \*     \*     \*
> >
> > (3) a Level 1 felony if it is committed under subsection (a)(1) . . . by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age.

[52] Here, consistent with INDIANA CODE § 35-46-1-4(a)(1), the charging information alleged that Woodworth had "knowingly place[d] [M.M.] in a situation that endangered [M.M.]'s life or health[.]" (App. Vol. 2 at 39). The alleged factual omission was that Woodworth had failed to "provid[e] immediate medical attention upon injury[.]" (App. Vol. 2 at 39). In addition, to support the elevation of the offense to a Level 1 felony, the State alleged that

Woodworth's failure to provide immediate medical attention upon injury had "result[ed] in the death of [M.M.]"  (App. Vol. 2 at 39).

[53]  "When the allegation of neglect is the failure to provide medical care, the State must show that the need for medical care was actual and apparent and the accused was actually and subjectively aware of that need."  *C.T. v. State*, 28 N.E.3d 304, 307 (Ind. Ct. App. 2015), *trans. denied*.  Here, there is no doubt that M.M.'s need for medical care was actual and apparent and that Woodworth was actually and subjectively aware of that need.  We must, therefore, determine whether Woodworth delayed in providing that medical care.

[54]  In *Lush v. State*, 783 N.E.2d 1191, 1198 (Ind. Ct. App. 2003), we explained that our Indiana Supreme Court established a reasonable parent standard in cases of neglect of a dependent for failing to timely obtain medical care.  Specifically, "'in order to determine whether [a] mother's conduct constituted medical neglect under the facts of [a] case, her conduct must be squared against the appropriate conduct of a reasonable parent, guardian, or custodian who finds a child in a like condition.'"  *Id*. (quoting *State ex rel. N.K.C.*, 995 P.2d 1, 4 (Utah Ct. App. 1999)).  Ultimately, whether a parent's or a caregiver's delay in providing medical care for an ailing child constitutes criminal neglect is a question for jurors to answer.  *Lush*, 783 N.E.2d at 1198.  We must simply determine whether their answer is reasonable.  *Id*.

[55]  In the *Lush* case, Lush cared for his two-year-old stepdaughter, H.R. ("H.R."), while H.R.'s mother ("Mother") worked.  On September 20, 1996, Mother

went home for lunch at 11:00 a.m. At that time, she noticed nothing unusual about H.R., who was sitting at the kitchen table eating breakfast. Further, Mother saw no injuries on H.R. Lush, accompanied by H.R., drove Mother back to work at 11:15 a.m. That same afternoon, Lush telephoned Mother at work and asked her to meet him outside. Mother's co-worker saw Lush drive up to the front of the building between 1:30 p.m. and 1:45 p.m. Lush, who was driving at a fairly normal speed, sat outside and waited for Mother to come out and talk to him. After Mother had briefly talked to Lush, Mother's co-worker saw Mother hurry back inside the business. Mother's co-worker further saw Lush shake H.R. as if he were attempting to wake her. When Mother ran back out to the car, Lush handed H.R. to her, and they left the parking lot of the business fairly quickly.

[56] At approximately 2:00 p.m., Lush and Mother arrived at the emergency room of a Columbus hospital with H.R., who was unconscious and not breathing. A pediatrician at the hospital determined that H.R. should be flown by helicopter to Riley Hospital for Children ("Riley") in Indianapolis. When H.R. arrived at Riley, Dr. Luerrson ("Dr. Luerrson") performed the initial examination of H.R. Dr. Luerrson noticed that H.R. had linear bruising on her legs and back, substantial bruising on her face and neck, her eyes were swollen, and she had retinal hemorrhaging that was not consistent with an accidental injury. In addition, H.R. had sustained an acute subdural hematoma that was collecting blood and was rapidly herniating her brain stem. That injury was likely inflicted by an angular momentum that had rendered H.R. immediately

unconscious. The injuries appeared to have been inflicted within a few hours before H.R. had arrived at the emergency room in Columbus. If left untreated, H.R. would have died. H.R. had to be placed in a medically induced coma for two weeks, and one year later, she had permanent brain damage, walked with a limp, and remained weak on one side of her body.

[57] The State charged Lush with Class B felony neglect of a dependent. The State specifically alleged that Lush had deprived H.R. of medical care and that the deprivation had resulted in serious bodily injury. The jury convicted Lush as charged. On direct appeal, Lush argued that "there [was] insufficient evidence to sustain his conviction of neglect of a dependent for his conduct after inflicting the life-threatening injuries on H.R. while she was in his exclusive care." *Id.* at 1097. Lush specifically contended that his delay in rushing H.R. to the hospital had not deprived her of necessary medical care and had not caused her serious bodily injury.

[58] This Court reviewed the evidence and first concluded that there was evidence from which a reasonable jury could have concluded that Lush himself had inflicted the life-threatening injuries upon H.R. *Id.* We further noted that because Lush had been aware of the severity of H.R.'s injuries, he was in a position to understand the urgency of the situation and that medical attention was needed. *Id.* Although Lush argued that he had not deprived H.R. of medical care by picking up Mother at work before taking H.R. to the hospital, we noted that under the facts and circumstances of this case, the jury had found that a fifteen-minute delay had been a deprivation of medical care. *Id.* at 1198.

We further explained that "[i]t [was] entirely plausible for the jury to have found that a reasonable parent would not have done as [Lush] did – drive past a hospital in order to pick up the child's mother from work before taking an unconscious but breathing child back to the hospital." *Id.* at 1198. We, therefore, affirmed Lush's conviction.

[59] Here, the facts before us are distinguishable from those in *Lush*. In the *Lush* case, there was evidence from which a reasonable jury could have concluded that Lush had inflicted the life-threatening injuries on H.R. In the instant case, the jury determined that the State had failed to prove beyond a reasonable doubt that Woodworth had inflicted an injury on M.M. Thus, unlike Lush, Woodworth, who had not inflicted an injury on M.M., was not in a position to understand the severity of M.M.'s injuries.

[60] Indeed, when M.M. did not take her bottle at 1:15 p.m., Lori had initially believed that M.M., who had woken up fussy and whiny from her nap, was still just a little bit sleepy. However, when M.M. "didn't look right[,]" Woodworth immediately texted Mother and asked her to call Woodworth. (Tr. Vol. 5 at 46). While Woodworth was attempting to contact Mother, Lori and Tasha tended to M.M. by placing a cold rag on M.M.'s head to help her wake up. When the cold rag had no effect, Lori and Tasha took M.M. outside to get some fresh air. When Mother telephoned Woodworth and learned that M.M. was having difficulty waking up from her nap, Mother directed Woodworth to call 911. Woodworth called 911 at 1:24 p.m., just nine minutes after she had noticed that M.M. "didn't look right." (Tr. Vol. 5 at 46).

[61] Based on these facts and circumstances, we conclude that Woodworth's actions were those of a reasonable caregiver who finds that a child in her care is having difficulty waking up from a nap and does not "look right." (Tr. Vol. 5 at 46). Stated differently, we conclude that Woodworth's nine-minute delay in calling 911 - while she contacted Mother and while her mother and sister simultaneously tended to M.M. by applying a cold rag to M.M.'s head and taking her outside to get some fresh air - was not a failure to provide immediate medical attention to M.M. Woodworth did not knowingly place M.M. in a situation that endangered M.M.'s life. Thus, the evidence presented at trial is insufficient to support her conviction of Level 1 felony neglect of a dependent resulting in death. Accordingly, we reverse Woodworth's conviction.[3]

---

[3] We further note that even if Woodworth had failed to provide immediate medical care to M.M., we agree that "the State here presented no evidence to prove beyond a reasonable doubt that [Woodworth]'s failure to provide immediate medical care or call 911 immediately resulted in [M.M.]'s death." (Woodworth's Br. 25). This Court has previously determined that "the phrase 'results in the death of a dependent' for purposes of the neglect statute . . . implicates proximate causation." *Patel*, 60 N.E.3d at 1052. Under this standard, the State must, at a minimum, prove beyond a reasonable doubt that the death would not have occurred "but for" the neglectful act. *Id*.

In *Patel*, the defendant, who was attempting to self-induce an abortion with misoprostol pills, gave birth to a premature male infant. Rather than take the infant to a hospital, Patel threw him in a dumpster, where he was later found dead. The State charged Patel with Class A felony neglect of a dependent resulting in death, which is the equivalent of the current Level 1 felony neglect of a dependent resulting in death. However, at trial, because the doctors were unsure of the infant's condition at birth, they could not testify with any certainty as to the effectiveness of medical intervention. Instead, they opined that it was "absolutely possible" medical intervention could have saved the infant. *Id*. at 1053. On appeal, we explained that such possibilities did not amount to proof beyond a reasonable doubt that the infant's death would not have occurred but for Patel's failure to obtain medical care. *Id*. at 1054. We, therefore, vacated Patel's Class A felony conviction and remanded her case to the trial court to enter judgment of conviction for Class D felony neglect of a dependent, which is the equivalent of the current Level 6 felony neglect of a dependent, and to sentence Patel accordingly. *See id*. at 1062.

Here, our review of the record of the proceedings reveals absolutely no testimony regarding whether M.M.'s death would not have occurred but for Woodworth's failure to obtain immediate medical care. The State directs us to Dr. Glick's testimony that in the adult world, the goal is to get the person medical treatment within one hour because you can reverse the disease. However, Dr. Glick's testimony was offered to support her previous testimony that when a baby is shaken, the child is immediately symptomatic. Dr. Glick's testimony was not given in response to a question that was specific to M.M. and whether her death would have occurred but for

Reversed.

Vaidik, J., and Mathias, J., concur.

---

Woodworth's failure to obtain immediate medical care.  Indeed, the record reveals that the State never posed this question to any of its witnesses.  Thus, even if Woodworth had failed to obtain immediate medical care for M.M., the State has not proven beyond a reasonable doubt that M.M.'s death would not have occurred but for Woodworth's failure.